LONZA, INC., Petitioner, *v.* THE POLLUTION CONTROL BOARD *et al.*,
Respondents.

(No. 73-133; 

Third District—August 13, 1974.

John C. Parkhurst, of Leiter, Newlin, Fraser, Parkhurst & McCord, of Peoria, for petitioner.

Larry R. Eaton, Assistant Attorney General, of Springfield, for respondent.

Mr. JUSTICE STOUDER delivered the opinion of the court:

This action was brought by the Environmental Protection Agency against two respondents, Ashland Chemical Company and Baird Chemical (now Lonza, Inc.), by a complaint filed on May 1, 1972, alleging violations of section 9(a) of the Environmental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1009(a)) by causing air pollution in the form of odor contaminants either alone or in combination with other sources at their adjacent plants near Mapleton, Peoria County, Illinois. The Board, after a hearing, ordered each respondent to pay a $10,000 fine, submit a program for abatement of their odor nuisance and achieve abatement within a certain time. From this order Lonza seeks review pursuant to statute and Supreme Court Rule 335 (Ill. Rev. Stat. 1971, ch. 110A, par. 335). Ashland has sought review under a separate action.

The Lonza plant, originally owned by Baird, was constructed shortly after the Ashland plant facilities, about 1961, and Lonza's premises are immediately adjacent to and roughly west of Ashland's plant. The two plants are separated from the residential part of Mapleton by Route 24 and a distance of a few hundred yards.

The Ashland plant is a basic chemical plant which engages in the production of a wide variety of products. About 65 percent of Lonza's plant production consists of producing sorbitol, a 70-percent sugar solution.

Both plants utilize waste-water treatment systems. Ashland's system proceeds to an 18.5-acre lagoon and then to a 105-acre lagoon from which there is no effluent. Lonza's system has two 1-acre receiving lagoons which have no effluent discharge.

One of the issues raised by Lonza in its brief relates to the constitu-

tionality of the penalty provisions of the Environmental Protection Act. *City of Waukegan v. Pollution Control Board,* 57 Ill.2d 170, 311 N.E.2d 146, and *City of Monmouth v. Pollution Control Board,* 57 Ill.2d 482, 313 N.E.2d 161, decided after Lonza filed its brief, have now settled this issue and hold the penalty provision to be constitutional.

■■ Lonza also raised an issue concerning the propriety of the denial of its motion to sever its case from that of Ashland. Lonza's contention is that the denial of the motion to sever constituted an abuse of discretion prejudicial to Lonza. We hold here that there was no abuse of discretion particularly in view of section 9a of the Environmental Protection Act under which section this action against the two companies was brought, which provides that emissions which cause air pollution either alone or in combination with contaminants from other sources are prohibited. This denial of severance did not of course relieve the Pollution Control Board of its duty to find that each company was a source of the pollution.

■■ Before discussing the sufficiency of the evidence and the propriety of the Board's order it would be helpful to keep in mind the stated purpose of the Illinois legislature in passing the Environmental Protection Act is "* * * to establish a unified, statewide program supplemented by private remedies, to restore, protect and enhance the quality of the environment, and to assure that adverse effects upon the environment are fully considered and borne by those who cause them." (Ill. Rev. Stat. 1971, ch. 111½, par. 1002(b).) In order to attain the stated goals, one of the requirements for membership on the Pollution Control Board is that the members be technically qualified, and one of the authorizations given to the Director of the Environmental Protection Agency is to employ technical assistants and consultants. This requirement of technical qualification for Board members and the provision for hiring of technical assistants is not only to enable the determination of the existence of pollution but more so to render advice and assistance to polluters and potential polluters to assist them in complying with the requirements of the Environmental Protection Act. The Act's purpose is to protect the environment of the State of Illinois. It was not enacted primarily to punish polluters but rather to protect, enhance and restore the environment by eliminating, lessening and preventing pollution.

The principal issue is whether Lonza was the source of odor contaminants constituting air pollution within the meaning of the Environmental Protection Act. In this respect we are concerned with the construction, interpretation and application of the statutory provisions in order to ascertain the intention of the legislature.

Air pollution is defined in section 3(b) of the Act as follows, "'Air

Pollution' is the presence in the atmosphere of one or more contaminants in sufficient quantities and of such characteristics and duration as to be injurious to human, plant, or animal life, to health, or to property, or to unreasonably interfere with the enjoyment of life or property." The first question relating to this definition of air pollution is whether the "or" preceding "to unreasonably interfere with the enjoyment of * * *" is used in the disjunctive sense or in the conjunctive sense.

■■ There is considerable support in the cases for construing the term "or" in a statute to mean "and." (*Moriarty v. Murphy*, 387 Ill. 119, 55 N.E.2d 281 (1944); *People ex rel. Watson v. House of Vision*, 16 Ill.App. 3d 487, 306 N.E.2d 697 (1973); *Mills v. Village of Milan*, 68 Ill.App.2d 63, 214 N.E.2d 915 (1966); *Goldblatt v. City of Chicago*, 30 Ill.App.2d 211, 174 N.E.2d 222 (1961).) The primary reason for such a construction is to effectuate the intention of the legislature where there is ambiguity as to its meaning. In *Moriarty* the court held, "It is the settled law of this State that the words 'or' and 'and' will not be given their literal meaning when to do so renders the sense of a statutory enactment dubious. The strict meaning of such words is more readily departed from than that of other words. Where it is necessary to effectuate the intention of the legislature, the word 'or' is sometimes considered to mean 'and', and the word 'and' to mean 'or'." 387 Ill. at 129.

The difference is that if the "or" is used in the disjunctive sense then air pollution, for the purposes of the Environmental Protection Act, exists either when there is "injury to * * * or * * * unreasonable interference with the enjoyment of life or property." It would be necessary in such case to envisage circumstances where there is unreasonable interference with the enjoyment of life or property and at the same time no injury to life or property. If, however, the "or" preceding "to unreasonably interfere with * * *" is used in the conjunctive sense, then air pollution, for the purposes of the Act, must be more than merely an injury. This injury must unreasonably interfere with the enjoyment of life or property. This latter use of the word "or" to mean "and" would also serve to give significance to section 33(c) of the Act, which sets forth four categories of facts and circumstances which the Pollution Control Board shall take into consideration bearing on the reasonableness of the emissions, discharges or deposits.

This action was brought under section 9(a) of the Environmental Protection Act, which prohibits the discharge or emission of any contaminant so as to cause or tend to cause air pollution. Air pollution is defined in section 3(b) (quoted at length above). Contaminant is defined in section 3(d). Section 33(c) sets forth facts and circumstances bearing upon the reasonableness of the emissions or discharge. Section 33(c) provides:

"In making its orders and determinations, the Board *shall* [emphasis added] take into consideration all the facts and circumstances bearing upon the reasonableness of the emissions, discharges or deposits involved including, but not limited to: (i) the character and degree of injury to, or interference with the protection of the health, general welfare and physical property of the people; (ii) the social and economic value of the pollution source; (iii) the suitability or unsuitability of the pollution source to the area in which it is located, including the question of priority of location in the area involved; and (iv) the technical practicability and economic reasonableness of reducing or eliminating the emissions, discharges or deposits resulting from such pollution source. * * *"

■■ The argument has been made that the factors in section 33(c) are relevant only as matters of defense, yet in *City of Monmouth v. The Pollution Control Board*, 57 Ill.2d 482, 487, 313 N.E.2d 161, the supreme court, in responding to respondent's contention that section 9 of the Environmental Protection Act was unconstitutional for the reason that it did not contain sufficient standards for determining what constitutes air pollution declared, "We hold that section 9(a), when read in conjunction with sections 3(b), 3(d) and 33(c), contains sufficient standards." Accordingly, to determine the existence of air pollution it *is* necessary to examine the facts listed in section 33(c). The reasonableness described in section 33(c) refers both to the cause and effect of the emissions.

■■ Section 31(c) provides that the burden shall be on the Agency or other complainant to show either that the respondent has caused or threatened to cause air or water pollution. According to the *Monmouth* case a necessary prerequisite to determining the existence of air pollution is to examine the factors in section 33(c). Therefore, such examination becomes part of complainant's burden under section 31(c). Although section 31(c) does not so state, there can be little doubt but that the respondent may deny the allegations of the complaint, may present evidence in support of his position, may argue with respect to disputed factual issues and disputed inferences, and may otherwise oppose the theories proposed by the complainant.

Although not an issue in this case it should be noted that further provision of 31(c), providing "* * * If such proof has been made, the burden shall be on the respondent to show that compliance with the Board's regulations would impose an arbitrary or unreasonable hardship," refers to a special defense in the nature of confession and avoidance. This special defense, consistent with the provisions of sections 35 through 38 (variances), seems to be directed at reasons why sanctions should not be imposed or abatement required because of the existence of special circumstances even though a violation exists.

■■ How section 33(c) and its various factors should be incorporated into the administrative process has caused some confusion and differences of opinion. In *Incinerator Inc. v. Pollution Control Board*, 15 Ill.App.3d 514, 521, 305 N.E.2d 35, the court, in discussing one of the factors in section 33(c), declared, "Since such testimony was presented to the Pollution Control Board, we can only conclude that the Board acted in compliance with section 33(c) of the Environmental Protection Act and considered such testimony in reaching its decision. This is all that is required by section 33(c) * * *." (See *Ford v. Environmental Protection Agency*, 9 Ill.App.3d 711, 297 N.E.2d 540; *Southern Illinois Asphalt Co. v. Environmental Protection Agency*, 15 Ill.App.3d 66, 303 N.E.2d 606.) In *Mystic Tape v. Pollution Control Board*, 16 Ill.App.3d 778, 306 N.E.2d 574 (petition for leave to appeal granted) the court, in contrast to the language of the *Incinerator* case, believed that specific findings should be made by the Board with relation to the standards specified in section 33(c). Whether such findings are required or not it is clear that a court of review will be considering the Board's application of such standards and the absence thereof may well affect the review of the Board's orders.

In any event, this court will consider all of the statutory provisions, including those specified in section 33(c), in order to determine whether the evidence supports the findings made by the Board and whether the remedial portions of the order are supported by the findings.

According to Lonza, the order of the Board is not supported by the findings and the findings not supported by the evidence, and in order to resolve these issues in light of the foregoing discussion of the statute a summary of the evidence is required. The first citizen witness concluded that odors were coming from both plants. The second citizen witness testified that she could not distinguish the source of the odors as being Ashland or Lonza. The third witness testified that he had no way of telling which plant the odors were coming from. The fourth witness testified that he would not try to tell which factory the odors came from because the factories were scrambled together and he could not separate them. The fifth witness testified that an odor she had smelled a few days prior to her testimony came from one of the chemical plants but she wasn't sure which one and that she had seen fog coming from those plants in the past that was right alongside the ditch between the plants on the Lonza side. It was her opinion that most of the fog came from Lonza. She testified further that the odor was not always with the steam and that every time she had seen the steam there was not an odor. The next witness testified that she had smelled the same odor as the fifth witness but she didn't know where it came from. The seventh witness testified he

associated the odors with smoke rising out of the vent pipes of both the plants. The last citizen witness testified the odor came from the vicinity of the two plants but since they were so close together it was hard to detect from which place they came.

The first witness from the Environmental Protection Agency testified that he could not specify the source of the smell and that he had never visited the Lonza facility. The second Agency employee testified that he noticed a pungent odor from the Ashland and Lonza area of Mapleton but that he could not specify the source. He stated that when he visited the Lonza plant he detected a pungent odor, but only for a fleeting moment, a fraction of a second, and that was the only odor that he noticed. On his second visit to Lonza he said he did not observe any odors, and on his third visit he inspected the plant facilities and did not notice any odors while inspecting the building other than background odor. He also stated that while inspecting the water-treatment facilities at Lonza he did not detect any odor attributable to the Lonza facility. The third Agency witness testified that he noticed a fishy odor in the Mapleton area but he was not able to determine the source of the odor. He testified that it was his opinion that the odor on one particular day came from the Ashland plant, and he stated that he had never been on Lonza premises. He said the only other time he was in the vicinity of the Lonza plant he detected an odor but could not attribute the odor to any particular source. He stated that Lonza was not dealing with the volume of waste that Ashland was. He stated that Lonza was dealing with about 25 to 50 gallons per minute whereas Ashland was dealing with 3,000 gallons per minute. The last witness from the Environmental Protection Agency stated that when he visited Lonza he noticed a hydrogen sulfide odor and that there was another odor also present but he could not exactly pinpoint it. He stated further that he was not able to say where that odor came from. He testified that he noticed an odor at the southwest corner of Lonza's property and noted the odor when he smelled the opening of one of the Lonza tanks but that he smelled no other odor and observed no haze or fog or visible emission from the Lonza plant.

James B. Munroe, plant manager for Lonza, admitted that Lonza had about three breakdowns a year whereby a total of about 3,000 pounds of hydrogen chloride (HCl) was emitted and that also due to mechanical breakdown Lonza emitted about 1,000 pounds of dimethylamine (DMA) per year. He further stated that on one or two occasions he was able to identify the first odor as coming from the Lonza plant when they had a specific problem with their dimethylamine system but on many more occasions he was unable to identify the fishy odor or where it came from.

He stated that he never was able to attribute the rotten-egg odor to any of the Lonza plant facilities. He stated, "In the past two years I have been able to attribute the acrid odor to the Lonza facility maybe two or three times a year. The cause of this acrid odor was the HCl system. Typically, a mechanical breakdown or malfunction somewhere in the system caused the HCl to emit."

In the present case the order of the Pollution Control Board required Lonza to submit a program for abatement of their odor nuisances and to pay a penalty of $10,000 for causing air pollution. It must be conceded due to the admission of Lonza's plant manager that Lonza was in fact the source of some odor contaminants. The issue is whether the evidence, including the admission of the plant manager, constituted sufficient evidence that Lonza was guilty of air pollution within the meaning of the Environmental Protection Act.

After reviewing the record, the findings, and the provisions of the statute we reach the following conclusions: one, from the testimony of the citizen witnesses there is little if any evidence as to the source of the odors about which they complained. Indeed, the testimony of these citizen witnesses is replete with direct statements that the witnesses could not tell that any of the odors came from Lonza; two, the technical representatives of the Agency who had investigated the complaints and the circumstances existing in the plants and community were unable to report and corroborate either the existence of the odor or the source of its emission either directly or hypothetically; three, when the testimony of Lonza's plant manager is reviewed in light of the testimony of the citizen and technical witnesses it cannot be said that the odors released from the breakdown of the equipment were the odors described by the citizen witnesses or the cause or source of the condition complained about; four, finally, in the absence of evidence concerning cause and source of the emissions and in particular the absence of any evidence by the technical witnesses concerning what could or should have been done, it is not possible to say what changes were technologically and economically feasible either in terms of what Lonza should have done in the past or what should be done in the future. We conclude from the foregoing that the evidence is insufficient to support the conclusion that Lonza was guilty of a violation of the statute.

■■ For the foregoing reasons, the order of the Pollution Control Board is vacated.

Order vacated.

SCOTT, P. J., and DIXON, J., concur.