CPC INTERNATIONAL, INC., Petitioner, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.

(No. 72-278;

Third District—December 6, 1974.

*Rehearing denied January 7, 1975.*

Mayer, Brown & Platt, of Chicago (James W. Gladden, Jr., of counsel), for petitioner.

William J. Scott, Attorney General, of Springfield (Larry R. Eaton and Prescott Bloom, Assistant Attorneys General, of counsel), for respondents.

Mr. JUSTICE ALLOY delivered the opinion of the court:

This is a petition seeking review of an order of the Illinois Pollution Control Board in which CPC International, Inc., (hereinafter referred to as CPC) had violated Rule 3—3.112 of the "Rules and Regulations Governing the Control of Air Pollution," in operation of the coal-fired boiler known as C boiler at the plant of CPC in Pekin, Illinois, and, in which also, a penalty of $15,000 was assessed against CPC. The proceeding was pursuant to section 41 of the Environmental Protection Act (Ill. Rev. Stat. 1973, ch. 111½, § 1041) and Supreme Court Rule 335 (Ill. Rev. Stat. 1973, ch. 110A, § 335).

The Board found CPC in violation of the Environmental Protection Act, which prohibits air pollution, and found CPC in violation of the Board regulations fixing an application emission standard for coal-fired boilers. In seeking a review in this case, CPC argues that the findings concerning the violation of the regulation were against the manifest weight of the evidence and alternately asserts that the Pollution Control Board erred in imposing a $15,000 fine when it found that the violation, if any, was not deliberate and was corrected as soon as CPC became aware of it.

CPC operates a corn-processing plant in Pekin, which handles some 70,000 bushels of corn each day. Part of its equipment consists of three coal-fired boilers, labeled A, B, and C. The first two boilers vent through a single stack and effectively comprise one unit. C boiler, installed more recently in 1958, has a separate stack.

In 1968, CPC conducted tests on its boilers in order to submit an air contamination emission reduction program (ACERP) to the Air Pollution Control Board, predecessor of the current Environmental Protection Agency and Pollution Board. The emission standard set at that time by the Pollution Control Board for coal-fired boilers was 0.60 lbs. of particulates per million BTU's of heat. This standard has been continued in the Regulation 3—3.112. CPC's test showed that A and B

boilers as a unit were emitting particulates in excess of the emission standard, and the air contamination emission authorities proposed the installation of pollution-control equipment which was completed in 1970.

C boiler, however, using a multi-cyclone or multi-clone dust collector, had an emission level of only 0.6056 lbs/million BTU, barely over the maximum allowable. CPC proposed no change for C boiler and the Air Pollution Control Board did not immediately object. Later, however, the Control Board did question CPC's use of the 90%-plus efficiency figure for the C boiler dust collector. The Board notified the corporation that it would apply the generally accepted 83% efficiency level, which would result in a higher estimated level of particulate emission, unless CPC could substantiate the 90% figure. Subsequently, 1968 tests by CPC produced data which, when applied to a manufacturer's performance curve, show the efficiency of the dust collector to be 92.5.%

The Pollution Control Board hearing in this case also showed that in early 1971, CPC's coal supplier began shipping coal of a higher ash content than before, as one of the supply mines became depleted. The coal used by CPC from 1967 through 1970 had an average ash content of about 8.3% while the coal used in 1971 averaged 9.9%. The parties apparently agree that the level of particulate emissions is relatively proportionate to the ash content of the coal.

On October 30, 1971, the Environmental Protection Agency (EPA) filed the complaint in this case as against CPC, charging air pollution in violation of section 9(a) of the Environmental Protection Act (Ill. Rev. Stat. 1973, ch. 111½, § 1009(a)) and alleged that the C boiler had been emitting particulates in violation of regulation 3—3.112 maximum level of 0.60 lbs/million BU. During the first part of November 1971, CPC inspected the dust collector on the C boiler and discovered considerable deterioration. There was extensive repair and replacement of parts by CPC, but CPC was still not satisfied with the operation of the dust collector. At that time, CPC, apparently for the first time, realized that the ash content of its coal was considerably higher than in previous years. Lower ash coal was obtained, and a stack test on the C boiler in February 1972 showed an emission level of .055 lbs/million BTU's, in compliance with 3—3.112. At the hearing in this cause, the EPA maintained that C boiler had operated at an emission level of 2.08 lbs/million BTU's before CPC had remedied the situation. CPC argued that the 75% deficiency factor used by EPA was too low and introduced evidence showing that, at an efficiency of 92.5%, the emission level of C boiler was only .626.

The Board found that, at least during 1971 while the higher ash content coal was being used, C boiler was in violation of the 3—3.112 emis-

sion standard of 0.60. Based on testimony of neighboring property owners, the Board also found that the CPC plant was emitting ash and soot deposits which interfered with the neighbors' lives and property. Occasional emissions of gluten were dismissed by the Board as insignificant with a warning to CPC to avoid the problem in the future. Following the findings of the violations, the Board also imposed a fine of $15,000.

■■ One issue which was raised by CPC was that the Pollution Control Board could not, constitutionally, be granted the power to impose a money penalty. We upheld such power in *Ford v. Environmental Protection Agency*, 9 Ill.App.3d 711, 292 N.E.2d 540 (3d Dist. 1973), and our determination was affirmed by the Illinois Supreme Court in the case of *City of Waukegan v. Pollution Control Board*, 57 Ill.2d 170, 311 N.E.2d 146 (1974). The effect of the cases was to confirm that the power to impose discretionary monetary penalties was constitutionally granted in the Act.

CPC contends also that the finding of violation of 3—3.112 was against the manifest weight of the evidence. As we have previously noted, "the Board's decision must be based on the record and material findings of fact must be supported by evidence." (*Central Illinois Light Co. v. Pollution Control Board*, 17 Ill.App.3d 699, 701, 308 N.E.2d 153 (3d Dist. 1974).) The burden of proving a violation is imposed on the EPA. (Ill. Rev. Stat. 1973, ch. 111½, § 1031.) The regulation 3—3.112 established a maximum allowable emission level of 0.60 lbs/million BTU. Even by the calculations made by CPC, using the 92.5% efficiency, the emission level of C boiler in 1971 was 0.626, slightly in excess of the limit.

The 75% suggested efficiency used by EPA was shown to be a general standard which that agency used when no accurate data for a particular stack is available. CPC contends that it showed the accuracy of the 92.5% level, but this figure was arrived at by plotting certain actual test data on the manufacturer's curve, and the foundation and accuracy of that curve were not clearly shown at the hearing. Also, the 92.5% efficiency was measured in 1968. Yet, during 1971 CPC used higher-ash-content coal, and by its own admission repaired the dust collector for the first time in 13 years after finding extensive deterioration in late 1971. The stack test of February 1972, which is concededly the only accurate method of determining the actual efficiency, showed a 90% collection efficiency, but this was after repairs had been made and with the use of lower-ash coal. While the EPA figures may have been unrealistic, the fact remains that even using the 92.5% figure, C boiler was still marginally in violation of the regulations.

■■ It is true that CPC did not realize the higher ash content of its 1971 coal until late in that year. Technically, the lack of knowledge is

no defense to a charge of pollution violations. (*Meadowlark Farms, Inc. v. Pollution Control Board*, 17 Ill.App.3d 851, 308 N.E.2d 829 (1974); *Bath, Inc. v. Pollution Control Board*, 10 Ill.App.3d 507, 294 N.E.2d 778 (1973).) Even with the supposed operating efficiency of 92.5% and with coal with an ash content of only 8.3%, C boiler was at best in fair compliance with the 3—3.112 emission standard. It could be argued that CPC should have been more careful in checking the operation of C boiler dust collector and the ash content of the coal it was using. CPC also points out that the Pekin plant as a whole was operating at an emission level of only 0.461 in compliance with a plant allowable of 0.480. While this is true, the wording of regulation 3—3.112 specifically provides that no one stack, such as C boiler, may exceed an emission level of 0.60. As a consequence, we believe that the evidence was sufficient to show a violation of 3—3.112 in the operation of C boiler during 1971.

On the next issue raised by CPC, however, we have a problem with different considerations. CPC argues that the fine of $15,000 was unjustified by the facts on the record. As we have indicated, the courts should carefully exercise the power to impose fines. (See *Ford v. Environmental Protection Agency*, 9 Ill.App.2d 711, and *City of Waukegan v. Pollution Control Board* (2d Dist. 1973).) "The imposition of a fine by an administrative agency must be supported by some reasonable factor appearing in the record." (*Bresler Ice Cream Co. v. Pollution Control Board*, 21 Ill.App.3d 560, 315 N.E.2d 619.) The objective is to avoid arbitrary imposition of punishment or fines. (See Environmental Protection Agency v. W. G. Best Homes Corp., 6 PCB 281; Environmental Protection Agency v. Baker, 5 PCB 415; Marquette Cement Mfg. Co. v. Environmental Protection Agency, 1 PCB 145.) In these cases the Board imposed penalties of from $3,000 to $10,000 for violations which were deliberate and long-term. As we compare the facts of such cases, even considering EPA's attempt to distinguish the cases, we must come to the conclusion that a $15,000 penalty imposed on CPC appears to be arbitrary and excessive.

■■ It was shown in the record that three adjacent industrial plants to CPC were operating under Board-issued variances during the period of time involved, and all three emitted particulates in considerably larger quantities than did CPC. While this is not necessarily an excuse, it should weigh heavily in the determination of whether to impose a monetary penalty on CPC. The policy of the Board is expressed as being one not to penalize those who are honestly trying. The purpose of the penalty provisions of the Environmental Protection Act is to protect enforcement of the Act and regulations thereunder (*City of Monmouth v. Pollution Control Board*, 57 Ill.2d 482, 490, 313 N.E.2d 161 (1974)). Punitive con-

siderations are secondary and as stated in *Lonza, Inc. v. Pollution Control Board,* 21 Ill.App.3d 468, 470, 315 N.E.2d 652:

> "The Act's purpose is to protect the environment of the State of Illinois. It was not enacted primarily to punish polluters but rather to protect, enhance and restore the environment by eliminating, lessening and preventing pollution."

The violations in the cause before us were remedied even before the Board hearing in June 1972. The violations were apparently not deliberate, and CPC took quick steps to correct the problem.

■■ While the finding of violation by CPC is supported by the record, the imposition of the $15,000 fine is not. The portion of the order imposing the fine of $15,000 is, therefore, vacated, but the remainder of the order is affirmed.

Vacated in part and affirmed in part.

SCOTT, P. J., and STOUDER, J., concur.