LLOYD A. FRY ROOFING COMPANY, Petitioner, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.

First District (5th Division)   No. 62658

Opinion filed February 17, 1977.

Arnstein, Gluck, Weitzenfeld & Minow, of Chicago (Burton Y. Weitzenfeld, Arthur L. Klein, and Paul L. Leeds, of counsel), for petitioner.

William J. Scott, Attorney General, of Chicago (George William Wolfe, Assistant Attorney General, of counsel), for respondents.

Mr. JUSTICE ROMITI delivered the opinion of the court:

The petitioner appeals from an order of the Illinois Pollution Control Board assessing a $40,000 penalty for certain air pollution violations after a remand by this court for reconsideration of the penalty originally assessed. On this appeal, the petitioner contends that (1) the Board erred in not considering evidence that the petitioner has been in compliance since 1972, since (2) no civil penalty may be assessed where the petitioner has already complied with the Environmental Protection Act and the agency regulations since then the penalty would be strictly punitive and not to aid enforcement. The petitioner also contends that (3) in both proceedings before the Board it was denied its right to present its arguments to the Board itself.

While we agree with the petitioner that certain evidence could have been considered by the Board we find that the assessment of a penalty was nonetheless justified under the facts of the case. However, we find the penalty to be excessive and reduce it to $10,000.

This case has already been before this court in 20 Ill. App. 3d 301, 314 N.E.2d 350, *appeal denied,* 56 Ill. 2d 587, *cert. denied,* 420 U.S. 996, 43 L.

Ed. 679, 95 S. Ct. 1438. The petitioner Fry is one of the world's largest manufacturers of asphalt roofing. The facility involved in the present proceeding is located in Summit, Illinois. During 1970 and 1971 this facility produced emissions far above the tolerable level which interfered with local residents' enjoyment of their property, caused their eyes to tear and sting and their throats to burn and gave them headaches and nausea. The children, because of the emissions, were unable to play baseball and football in contiguous areas. When the community residents complained, Mr. Fry, on December 18, 1970, told the members of a local group called Save Our Resources and Environment (S.O.R.E.) that he knew he was polluting, but S.O.R.E. could take him to court to make him stop.

On January 7, 1971, Fry filed a petition for a variance from the provisions of the Environmental Protection Act. The petition stated that Fry had installed no control equipment because of possible relocation problems caused by the proposed South-West Expressway. On February 26, 1971, S.O.R.E. filed a complaint before the Pollution Control Board alleging violations of section 9(a) of the Environmental Protection Act from February 17, 1971. By this time Cook County had also filed suit against Fry. A consent order under the terms of which Fry agreed to install emission control equipment by July 19, 1971 was entered on May 10, 1971. The Pollution Control Board was, during the hearings, advised of this order and that Fry was in the process of installing the equipment. On October 14, 1971, after refusing to hear written or oral arguments from either side, the Board found Fry guilty of violating section 9(a) of the Act and also of violating certain Rules and Regulations. It ordered Fry to cease and desist emissions from its Summit operation until such time as the air pollution abatement equipment had been installed and was properly operating; ordered Fry to advise the Board when the installation had been completed; determined that the proceeding should remain open for the Board to conduct a further hearing after such notice to determine if, in fact, the odors had been abated and assessed a penalty of $50,000.

On February 1, 1972, Fry notified the Board that the equipment had been installed. Subsequently, the Environmental Protection Agency and the other parties stipulated that there were no odors and that Fry was in compliance with the Act. On May 24, 1974, this court reversed the Board's finding of violations of the Rules and Regulations, not on the basis that the findings were not supported by the evidence, but because these violations had not been alleged in the complaint. Since the penalty had been assessed for all of the violations and did not indicate what portion of the penalty was imposed for the statutory violation, the court remanded the question to the Board for a redetermination of an appropriate penalty. The court did not, of course, rule on the question whether any penalty was appropriate under the circumstances.

On remand, the Board in its order of July 31, 1975, found that (1) the discharges of contaminants "have had an unreasonable and substantial adverse interference with the surrounding citizen's health, general welfare, and physical property"; (2) "the plant has a substantial social and economic value"; (3) "the manner in which Fry operates its plant is unsuitable to the surrounding area"; (4) "The counsel representing Fry and the manager of Fry, testified that no emission control devices were employed, but that plans for installation of such devices were being made. Although questioned by Fry, it is clear that the principle source of emissions causing the air pollution are the saturators where heated asphalt is absorbed by felt. No air pollution devices are employed on the stacks connected with the saturators. Mr. Harvey Hoffman, former Director of Environmental Control for the Fry plant, testified about pollution control equipment installed at Fry's 26 other asphalt roofing plants located throughout the country. The *Air Pollution Engineering Manual*, U.S. Department of Public Health (1967) was introduced as EPA Exhibit 3. This exhibit depicts the state of the art in emission control for asphalt saturators. This evidence establishes that it would be both technically practicable and economically reasonable for Fry to install control equipment to abate the violation of Section 9(a)."

The Board then concluded:

"Because of the great degree of unreasonable interference with the enjoyment of life and property of the residents surrounding Fry, we find that a substantial penalty is warranted to compel Fry to achieve compliance. As noted by the Court, 'Mr. Fry told the group (members of S.O.R.E.) that he knew he was polluting, but S.O.R.E. could take him to Court to make him stop.' This occurred at a meeting on December 18, 1970. Evidently S.O.R.E. listened, as they filed the present complaint on February 21, 1971, some 73 days later.

It is our determination that a penalty of $40,000 should be imposed against Fry for the violation of Section 9(a). The original Opinion would have imposed a penalty of $9,000 for the Air Rule violation and $1,000 for the failure to file an ACERP. By imposing a substantial penalty for the violation of Section 9(a) of the Act, the Board feels that Fry will be more likely to comply with the provisions of the Act without S.O.R.E. having to take Fry to Court again. We therefore, impose this penalty not as a punitive measure, but rather as an aid to the enforcement of the Act."

Fry filed a petition for rehearing pointing out the language in the 1975 opinion indicating that Fry was not presently in compliance with the Act and pointing out that: (1) during the hearings preceding the original 1971 opinion the Board was advised of the Agreed Order and that Fry was

even then in the process of installing the equipment and that the order even referred to this fact; (2) on February 1, 1972, Fry advised the Board that the installation was complete and on March 9, 1973, all the parties stipulated to the Board that no odor was found to be emanating from the Fry stack; (3) this order "obviously" overlooked the fact that the equipment was installed more than three and a half years before at a cost in excess of $150,000 and that the Board then held Fry to be in compliance.

The Board denied the petition for rehearing and the request to vacate the penalty on the grounds that the information relied on by Fry is outside the record of hearings compiled by the Board in reaching its prior determination and outside of the record presented to the appellate court on appeal.

## I.

While it is not clear from the record, apparently the Board believed that it could not consider the evidence as to compliance and intended compliance because it was outside the record. Both factually and legally this was erroneous.

At the time of the October 14, 1971, order, the Board was fully aware of the fact that Fry was subject to a court order to install the devices and was in the process of so doing. This court in its first opinion also referred to the court order. Furthermore, the October 14, 1971, order held the proceedings open for proof of compliance. The Board in its subsequent orders has treated the subsequent proceedings as an implementation of the October 14, 1971, order. And all of these orders were certified as part of the record by the Clerk of the Pollution Control Board. Having treated the record all along as one continuing proceeding and record, it is now inconsistent of the Board to say that it is not.

■■ ■ But even if the record had not contained evidence of compliance, the Board was at liberty to open the record and receive evidence of compliance. Even in civil cases, if the issue is not determined on its merits and the judgment is reversed and the cause remanded with directions to proceed in conformity with the views expressed in the opinion, a retrial may be had, and evidence offered by either party which falls within the principles announced must be received even though it is new evidence. (*Roggenbuck v. Breuhaus* (1928), 330 Ill. 294, 161 N.E. 780; see also *Vendo Co. v. Stoner* (1974), 58 Ill. 2d 289, 321 N.E.2d 1, *cert. denied*, 420 U.S. 975, 43 L. Ed. 2d 655, 95 S. Ct. 1398.) It is only when the merits of the controversy and the ultimate rights of the parties are decided in a court of review that a reversal and remandment will deprive the court below of the right to allow amendments to the pleadings and to hear other evidence. *Roggenbuck v. Breuhaus* (1928), 330 Ill. 294, 161 N.E. 780.

Likewise, as pointed out in *Ford Motor Co. v. National Labor Relations Board* (1938), 305 U.S. 364, 373-74, 83 L. Ed. 221, 229-30, 59 S. Ct. 301, 306-07, when reviewing agency decisions:

> "It is familiar appellate practice to remand causes for further proceedings without deciding the merits, where justice demands that course in order that some defect in the record may be supplied. Such a remand may be made to permit further evidence to be taken or additional findings to be made upon essential points. * * *
>
> Such a remand does not dismiss or terminate the administrative proceeding. If finds are lacking which may properly be made upon the evidence already received, the court does not require the evidence to be reheard. * * * If further evidence is necessary and available to supply the basis for findings on material points, that evidence may be taken. * * * Whatever findings or order may subsequently be made will be subject to challenge if not adequately supported or the Board has failed to act in accordance with the statutory requirements."

The agency may also recall a witness for further testimony to make a new record, and may, upon the taking of additional evidence, find additional facts. (2 Am. Jur. 2d *Administrative Law* §766 (1962).) And an agency is not necessarily bound on remand by the same limitations that a trial court is. See *Federal Communications Com. v. Pottsville Broadcasting Co.* (1940), 309 U.S. 134, 84 L. Ed. 656, 60 S. Ct. 437.

On the other hand, normally an administrative agency is not required to open up the record and consider new evidence. (*National Labor Relations Board v. Donnelly Garment Co.* (1947), 330 U.S. 219, 91 L. Ed. 854, 67 S. Ct. 40.) Had the Board reasonably determined that such evidence would not have been relevant, there would have been no error in refusing to admit it. (*National Labor Relations Board v. Donnelly Garment Co.* (1947), 330 U.S. 219, 91 L. Ed. 854, 67 S. Ct. 40.) Equally, there would have been no error in disregarding irrelevant evidence already in the record.

■■ But here the Board apparently disregarded the evidence not because it deemed it to be immaterial but because it believed the evidence was not part of the record at the time of the original hearing and of the decision on appeal. We can only speculate as to whether the Board would have considered the evidence material if it had realized that it could consider the proffered evidence, both because most of it had been in the record in October 1971 and because it had the power to reopen the proceedings and consider new evidence.

The cases cited by the respondent to the effect the Board cannot consider violations outside the time span alleged in the complaint are not

relevant here since they simply stand for the proposition that an accused is entitled to know of that with which he is accused.

## II.

However, our determination that the Board could have considered evidence that (1) on October 14, Fry was in the process of complying with an agreed order to install pollution devices and (2) that those devices were working by February 1972 and the Board has found those devises to be satisfactory does not mean that the Board could not properly assess a penalty against the petitioner. *Bresler Ice Cream Co. v. Pollution Control Board* (1974), 21 Ill. App. 3d 560, 315 N.E.2d 619; *Chicago Magnesium Casting Co. v. Pollution Control Board* (1974), 22 Ill. App. 3d 489, 317 N.E.2d 689; *CPC International, Inc. v. Pollution Control Board* (1974), 24 Ill. App. 3d 203, 321 N.E.2d 58, and *High Lake Poultry, Inc. v. Pollution Control Board* (1975), 25 Ill. App. 3d 956, 323 N.E.2d 612, upon which the petitioner relies for the proposition that no penalties may be awarded once he is in compliance, are not in point. In *Bresler* the company had made efforts to eliminate the emissions even before it appeared any complaint had been made and had stopped the use of the offending incinerator three months before the Board hearing. Moreover, the violations were all *de minimis*. In *Chicago Magnesium*, the company had been in compliance with the Act for nearly six months when the complaint was filed. In *CPC* the violation was apparently not deliberate and CPC corrected it as soon as it became aware of it, before the Board hearing. Furthermore the Board had assessed a $15,000 penalty although in previous opinions it had only imposed penalties of from $3,000 to $10,000 for violations which were deliberate and long term. Finally, in *High Lake*, the Agency was really at fault for the High Lake's being forced to build without a license. High Lake had fully shown its willingness to cooperate and by the time of the decision was in substantial compliance with the Act.

Furthermore, it must be remembered that while the Board could have considered evidence as to what happened in 1972, the issue before this court still is what penalty could properly have been assessed in 1971. At that time Fry was not in compliance although, indeed, under the agreed order it should have been. Furthermore it had refused to cooperate with the neighborhood groups requesting compliance and had informed them that they must sue if they wanted it to stop polluting. This knowing and wanton violation of the community's right to a healthful environment is in no way similar to the good faith efforts of Bresler Ice Cream Company, Chicago Magnesium Casting, CPC International, Inc., and High Lake Poultry, Inc.

■■ ■ Accordingly, we find that a penalty was properly imposed

under the facts in this case. Additionally, while the civil penalty is imposed not primarily for punitive considerations, but to aid in the enforcement of the Act (*City of Monmouth v. Pollution Control Board* (1974), 57 Ill. 2d 482, 313 N.E.2d 161), this does not mean that a penalty can be imposed only to force the individual defendant to act. The assessment of penalties against recalcitrant defendants who have not sought to comply with the Act voluntarily but who have by their activities forced the Agency or private citizens to bring action against them may cause other violaters to act promptly and not wait for the prodding of the Agency.

■■ We do, however, conclude that under the totality of circumstances discussed herein, and in light of the penalties awarded in similar cases, a penalty of $40,000 is arbitrary and excessive and not supported by the findings made nor by the facts and circumstances present. As a result we modify the amount of the penalty imposed by reducing the penalty to $10,000.

### III.

■■ The petitioner also contends on this appeal as it did on the first appeal that its rights were violated by the refusal of the Board, over its protest, to allow either written or oral arguments before either the October 1971 decision or the July 1975 decision was rendered. This court ruled on the first appeal that the regulation permitting the filing of written briefs was a discretionary provision only. That ruling is now the law of the case and is binding on the court. *Boyer v. Atchison, Topeka & Santa Fe Ry. Co.* (1966), 70 Ill. App. 2d 214, 217 N.E.2d 303, *aff'd* (1967), 38 Ill. 2d 31, 230 N.E..2d 173, *cert. denied* (1968), 390 U.S. 949, 19 L. Ed. 2d 1140, 88 S. Ct. 1038; *Foss Park District v. First National Bank* (1974), 19 Ill. App. 3d 553, 312 N.E.2d 558.

For the reasons expressed in this opinion the order of the Pollution Control Board is affirmed as modified.

Affirmed as modified.

DIERINGER, P. J., and JOHNSON, J., concur.