THE ENVIRONMENTAL PROTECTION AGENCY, Respondent, *v.* CENTRAL ILLINOIS LIGHT COMPANY, Petitioner.

Third District No. 76-376

Opinion filed November 4, 1977.

O'Hern, Wombacher, Moon & Boos, of Peoria, for petitioner.

William J. Scott, Attorney General, of Springfield (Russell R. Eggert, Assistant Attorney General, of counsel), for respondent.

Mr. PRESIDING JUSTICE STOUDER delivered the opinion of the court:

In October 1975 respondent, Environmental Protection Agency, filed a complaint with the Illinois Pollution Control Board against petitioner, Central Illinois Light Company (CILCO), alleging CILCO had commenced construction of an electric generating station and a cooling lake reservoir without the necessary permits. This appeal is from the order of the Illinois Pollution Control Board finding petitioner, CILCO, constructed a waste-water source without a construction permit in violation of Water Pollution Rule 951, chapter 3, Pollution Control Board Rules and Regulations, and section 12b of the Environmental Protection Act (Ill. Rev. Stat. 1975, ch. 111½, par. 1012(b)). The Board fined CILCO $5,000 and ordered it to cease and desist such violations and to obtain all necessary permits.

■■■ Certain principles of law cited by petitioner CILCO are not disputed by respondent, Environmental Protection Agency. They are:

1. The burden of proof is on the Environmental Protection Agency in an enforcement hearing (section 31(c) of the Environmental Protection Act (Ill. Rev. Stat. 1976, ch. 111½, par. 1031(c) and *CPC International, Inc. v. Pollution Control Board*, 24 Ill. App. 3d 203, 321 N.E.2d 58);

2. The decision of the Pollution Control Board must be based on the record and material findings of facts must be supported by evidence (*Central Illinois Light Co. v. Pollution Control Board*, 17 Ill. App. 3d 699, 308 N.E.2d 153); and

3. It is the right and duty of the reviewing court to set aside a finding of violation if it is wholly unjustified by the evidence and clearly against the manifest weight thereof (*Central Illinois Light Co. v. Pollution Control Board*, 17 Ill. App. 3d 699, 308 N.E.2d 153).

The only issue on this appeal is whether the Pollution Control Board correctly construed and applied its own regulations regarding artificial cooling lakes. The underlying question, one of fact, is whether CILCO's reservoir is an "artificial cooling lake" or a "perched lake" and treatment works for the power station's thermal effluent. If the reservoir is an artificial cooling lake it is subject to the applicable effluent and water quality standards set by the Pollution Control Board and if it is a perched lake it is exempt from those standards. The term "artificial cooling lake" is defined in section 104 of chapter 3 of the Illinois Water Pollution Control Rules and Regulations as "any manmade lake, reservoir or other impoundment, constructed by damming the flow of a stream, which is used to cool the waters discharged from the condensers of a steam-

electric generating plant for recirculation in substantial part to the condensers."

At the time the Illinois Pollution Control Board created the perched lake exemption it discussed the rationale and criteria for this exemption in the following language:

> "The distinction, in summary, is based upon the way a cooling-water impoundment is constructed. Where artificial diking is erected, and water to fill the resulting enclosure is largely obtained by withdrawal from a nearby natural body of water such as a lake or river, the enclosure constitutes a treatment works. Commonly known as 'perched' or sidechannel lakes, these bodies of water are, as treatment works, exempt from the Board's water quality standards, and discharges into them are not subject to the thermal effluent standards.
>
> ⁂   ⁂   ⁂
>
> The other type of impoundment, an 'artificial cooling lake', encompasses the remaining field of cooling water enclosures at issue here. Generally formed by damming an existing water course which is itself a protected water of the State, such artificial cooling lakes remain subject to the Board's water quality and effluent standards." (*In re Water Quality & Effluent Standards Amendments, Cooling Lakes* (1975), 18 Ill. P.L.B. Op. 681.)

The Pollution Control Board argues the basis of the distinction is the common sense difference between a pond of water artificially created for the sole purpose of serving as a cooling lake and an existing body of water which is dammed and converted to the use of a discharge. The Board concludes on the facts of this case that the Duck Creek impoundment was an existing body of water which was dammed and converted to the use of a discharge. It argues further the record shows that Duck Creek is a natural water course and that although much of the water in it comes from land run-off, the creek itself preexisted any of CILCO's activities. Downstream about 1000 feet from the current CILCO site on Duck Creek the channel is about 20 feet wide and 6 feet deep with about a 17½ square-mile watershed. The Board argues that although there was some diking around the periphery of the lake, the impoundment was essentially created by building a dam across the creek and allowing water to fill in the natural contours of the land. It claims that pumping water from the Illinois River is more a matter of convenience than anything else and that the cooling lake would eventually fill through the natural flow of Duck Creek, *i.e.*, pumping water from the outside source merely achieves the same result faster.

CILCO, on the other hand, argues that although its reservoir receives

part of its water from the 9920-acre watershed, the majority of the water is pumped to the reservoir from the Illinois River. Using the Board's definition of a "perched" or "sidechannel lake" CILCO argues the first requirement, erection of artificial diking, was fulfilled in this instance by the construction by CILCO of a dam in connection with its power plant in order to create a reservoir.

The next element is water to fill the resulting enclosure must be largely obtained by withdrawal from a nearby body of water such as a lake or river. CILCO argues "largely" is defined generally to mean to a great extent or chiefly. CILCO had established a pumping station on the Illinois River for the purpose of supplying water to the reservoir and this pumping station imports about 63 percent of the water necessary to maintain the planned reservoir level from outside the watershed area.

CILCO has to keep pumping into the reservoir because the cooling process evaporates the water from the reservoir. In *In re Water Quality and Effluent Standards Amendments, Cooling Lakes* (1975), 18 Ill. P.C.B. Op. 681, the Board stated natural land contours "may" form part of the impoundment such that some run-off from adjacent lands enters these lakes. The record shows there would be run-off from the watershed of the Duck Creek area. Regardless of which estimates by the witnesses regarding the amount of the annual run-off is used, the amount of water pumped from the Illinois River would be substantially greater than half the total amount. The water in the Illinois River and the reservoir is, of course, "protected waters of the state" but the important thing is how these waters are introduced into the impoundment. In the instant case the waters came largely from the Illinois River, using "largely" to mean at least more than half.

■■ In the instant case it is conceded a cooling reservoir was constructed without a permit. In view of the entire record it is apparent to this court no permit was required since the reservoir here fits the Board's own definition of a "treatment works" or "perched lake" for cooling the thermal effluent as a result of the power plant operations. The Board's showing the watershed of the Duck Creek area drained into the reservoir did not fulfill its burden of proving the reservoir was an "artificial cooling lake" rather than a "perched lake."

For the foregoing reasons the order of the Illinois Pollution Control Board finding Central Illinois Light Company in violation of the Environmental Protection Act and Rules and Regulations of the Illinois Pollution Control Board is reversed.

Order reversed.

BARRY and SCOTT, JJ., concur.