ALLIED METAL CO., Petitioner, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.

(No. 59257;

First District (2nd Division)—September 24, 1974.

824

Cohen and Shapera, of Chicago (Benjamin R. Cohen, Louis Shapera, and Jerome Marvin Kaplan, of counsel), for petitioner.

William J. Scott, Attorney General, of Chicago (Kenneth J. Gumbiner and Richard W. Cosby, Assistant Attorneys General, of counsel), for respondents.

Mr. JUSTICE DOWNING delivered the opinion of the court:

Allied Metal Co., petitioner (hereinafter Allied), an operator of a Chicage plant engaged in the production of metal ingots, appeals from an order entered by the Illinois Pollution Control Board (hereinafter Board) which found Allied guilty of causing air pollution and violating permit requirements, resulting in a fine of $2,500 as a penalty for the violations.[1]

Illinois' Environmental Protection Agency (hereinafter Agency) filed a complaint before the Pollution Control Board of the State of Illinois alleging that Allied, on December 27, 1971, and subsequently, operated its plant in such a manner as to cause or allow the emission of particulate matter, gases, odors, and other contaminants into the environment, so as to cause air pollution in Illinois, in violation of section 9(a) of the Environmental Protection Act (hereinafter Act) (Ill. Rev. Stat. 1971, ch. 111½, par. 1009(a)). Section 9(a) reads:

"No person shall:

(a) Cause or threaten or allow the discharge or emission of any contaminant into the environment * * * so as to cause or tend to cause air pollution in Illinois, either alone or in combination with contaminants from other sources, or so as to violate regulations or standards adopted by the Board under this Act; * * *."

The complaint further alleged that from January 27, 1972, to the time of the filing of the complaint (April 20, 1972), Allied had allowed or

[1] Section 41 of the Environmental Protection Act, effective July 1, 1970 (Ill. Rev. Stat. 1973, ch. 111½, par. 1041), provides for judicial review of orders of the Pollution Control Board by the appellate court. This appeal is before the court pursuant to Supreme Court Rule 335 (Ill. Rev. Stat. 1973, ch. 110A, par. 335). Rule 335(h) provides, in pertinent part, that sections 1, 9(c), 10, 11, and 12 of the Administrative Review Act (Ill. Rev. Stat. 1973, ch. 110, pars. 264, 272(c), 273, 274, and 275) are applicable to proceedings to review the orders of the Pollution Control Board.

permitted particulate-matter emissions from its plant in violation of section 3—3.111 of the Rules and Regulations Governing the Control of Air Pollution. Section 3—3.111 reads, in part:

"Particulate matter emissions from any process shall be limited by process weight in accordance with Table 1 of Chapter III except as provided in Rule 3—3.300, or as provided by separate regulations for specific processes under Rule 3—3.200."

In an amendment to the original complaint, the Agency further alleged that Allied had installed or constructed new equipment capable of emitting air contaminants to the atmosphere and equipment intended for eliminating, reducing, or controlling air contamination without a permit, in violation of secton 3—2.110 of the said rules, which were continued in effect by section 49(c) of the Act (Ill. Rev. Stat. 1973, ch. 111½, par. 1049(c)). Section 3—2.110 of the rules provides:

"A permit shall be required * * * for installation or construction of new equipment capable of emitting air contaminants to the atmosphere and any new equipment intended for eliminating, reducing or controlling emission of air contaminants."

After conducing hearings and receiving evidence, the Board, by order dated June 7, 1973, adjudged Allied guilty of causing air pollution and of violating the permit requirements as alleged in the Agency's complaint, and assessed a fine of $2,500 against Allied as a penalty for the violations. The Board's order further provided that Allied was to submit to the Board and the Agency, within 60 days from the date of the order, a plan for bringing its operations into compliance with the Act and the above-mentioned rules and regulations governing particulate emissions. Subsequently, the Board granted Allied a stay with respect to the portion of the order assessing the fine. Thereafter, Allied filed a petition for review of the order with this court.

On appeal, Allied contends:

1) that the Agency failed to meet its burden of proof in that:
   a) the alleged violations, as predicated upon theoretical calculations, were refuted by "stack tests" performed by experts for Allied;
   b) the Agency's evidence of visual observations was insufficient to support the finding of a violation; and
   c) the order of the Board was unsupported by findings, as required by Chapter 111½, Section 1033(c) of the Illinois Revised Statutes;
2) that the Board's finding that Allied had installed new equipment capable of emitting air contaminants is against the manifest weight of the evidence adduced below; and

3) that the Board does not have the power to assess a fine.

In the interest of clarity, we shall review and summarize the voluminous evidence as it relates to the particular allegations of the Agency's complaint.

Allied is the operator of a plant engaged in the production of metal ingots at 2059 South Canal Street in Chicago. The basic products of Allied's operation are aluminum-alloy and zinc-alloy ingots, which production represents approximately $5,500,000 in sales per year, or ½% to 1% of all sales of such products produced in the country's secondary aluminum industry. The ingots are sold to manufacturers and foundries. Allied maintains a weekly payroll of approximately $10,000, and the only shareholders of the company are Marvin Fink, an Allied vice-president, and his father-in-law.

Allied's plant consists of four units, the main plant being approximately 124 feet by 169 feet by 75 feet; the roof of the main plant has six stacks, each with a built-in exhaust fan. The plant is surrounded on the east by railroad tracks; on the north by the south branch of the Chicago River; on the west by Canal Street, which supports a large volume of vehicular traffic; and on the south by an industrial building.

Allied is in the business of recycling aluminum and zinc scrap, as well as some lead. The scrap arrives at the plant in 600-pound bales or containers and is weighed, graded, and sorted; the bales are so compressed and tied that, when their steel bands are removed, the scrap may be sorted, piece by piece.

Allied's equipment consists of two "reverberatory" furnaces, two "sweat" furnaces, two zinc pots, one boring dryer, one lead pot, and a smoke consumer or gas-fired afterburner. Irony aluminum scrap is processed through the sweat furnaces to remove the iron, which leaves molten aluminum and "free" iron. The boring dryer takes in material which has excess moisture or combustible contaminants and delivers clear aluminum and magnetized iron. The reverberatory furnaces consume and smelt clean aluminum lead, which is then poured into ingots. The volume output of lead is negligible. The zinc pots consume high grade, pure zinc, together with pure aluminum, to produce an alloy called "Zanak." The afterburner consumes smoke given off by the boring dryer and one of the sweat furnaces.

With respect to the alleged section 9(a) violation, the Agency's case rested largely upon the testimony of two workmen who were employed in the vicinity of Allied's plant. Both men worked near the plant, one being at his work site about three times each day, the other being near the plant 5 days per week. Both workmen identified Allied's plant as the source of the smoke they observed. One testified that the smoke

caused him to experience smarting of the eyes and a burning sensation in the chest; the other testified that, when the smoke came in his direction, his eyes smarted and he choked and coughed. Both testified they experienced discomfort several days each week, and one witness stated that he could distinguish between the odor of diesel-engine smoke from nearby railroad engines and the odor of smoke emitted from Allied's plant. The other Agency witness testified that he had not confused the smoke emitted from the Allied plant with emissions from traffic, industrial plants nearby, or from diesel-train traffic. Both workmen stated that they had not seen a doctor concerning their alleged afflictions caused by Allied's emissions.

As part of its defense on the section 9(a) violations, Allied called two workmen who worked in the vicinity of the Allied plant. One witness, a superintendent at an industrial plant adjacent to Allied's, testified that he had observed light smoke coming from the Allied plant, but that the smoke had not bothered him; he further testified that, although he could not see Allied's plant stacks from his office, he had observed the smoke when he walked around his own plant. The other workman, a bridge-tender, testified that he had a clear view of Allied's plant, and that he had never seen any smoke coming from the plant, though he had observed "steam" emitting therefrom; he further stated that he had never been bothered by the "steam."

Regarding the alleged permit violation under section 3—2.110 of the Rules and Regulations, the Agency's witness, Laxmi Kesari, an engineer, testified that, when he had visited the Allied plant on December 27, 1971, two zinc melting pots were under construction. It is to be noted that Allied, in one of its briefs before this court, admits that the said equipment was under construction in December, 1971, but that Allied never regarded the equipment as a "viable emission source," as each pot allegedly gave off a "trifling amount" of .1 pounds per hour of particulates. It is therefore contended by Allied that a permit for such installation was not required. Accordingly, Allied concludes, the decision of the Board on the permit violation is contrary to the manifest weight of the evidence adduced below.

Concerning the alleged violation of section 3—3.111 of the Rules and Regulations, the Agency's engineer testified, in pertinent part, that, based upon his calculations derived from information contained in the Federal publication "Compilation of Air Pollutant Emission Factors" and information supplied by Allied, he had concluded that the allowable pounds-per-hour emissions were 15.1 pounds; that the plant's actual emissions were 26.72 pounds per hour; and that the excess emissions were 11.63 pounds per hour. The Agency at no time conducted "stack"

tests, and the engineer's calculations, he testified, revealed that Allied's two reverberatory furnaces and at least one of the plant's sweat furnaces were the major sources of particulate emissions.

To controvert the Agency's calculations, Allied called as a witness George Sterba, a consultant for a Chicago engineering firm which had been engaged by Allied to determine the concentration of particulate matter emanating from the roof stacks of its plant. Sterba testified, in part, that he had conducted emission source tests in order to determine the concentrations. The procedures he utilized—not "formal" stack tests, but "modified" versions thereof—included a filter-test method of rapid weight distribution of dust and gas streams in order to evaluate the dust being emitted from the stacks. Sterba testified that the modified stack-test procedure he employed was used in various parts of the country; that he used the same apparatus and instrumentation that would have been applied in a formal test; that he ascertained that the allowable emissions from the plant were approximately 14 pounds per hour, based upon a "process weight" of 6½ tons; that, with four roof stacks in operation, the measured particulate emission was calculated to be 4 pounds per hour, which was within allowable emission standards; and that a formal stack test would not have disclosed any greater or more representative quantities of emissions.

Another engineer, Charles Licht, who had been engaged by Allied to prepare a permit application, testified on Allied's behalf. He stated that, after having physically reviewed the Allied plant, and after having established equipment production rates and the quantity of potential particulate emissions from the equipment, he concluded that the plant itself, with its 75-feet-high ceiling, was functioning as an air-pollution control device—a "settling chamber." Licht testified that his calculations indicated that the total plant emissions, under normal operating conditions, would be 5.36 pounds per hour, well below the allowable 14.3 pounds per hour specified in the Rules and Regulations. He further testified that the total maximum emission rate would be approximately 8.2 pounds per hour.

The Agency's engineer was called to rebut Licht's "settling chamber" theory, and he testified that, by his calculations, 100% of all particulates 100 microns in size would be lofted from the building and that the settling-chamber theory was in error. Licht, being recalled as a witness, insisted that it was impossible for all particulates of that size to be lofted through Allied's fans.

The Agency called Frederick Smith, an employee of the Agency, as a rebuttal witness in connection with the testimony of George Sterba. He testified that, though Sterba was well experienced in his field, be-

cause of the methods he had used in taking the "modified" stack tests, the value and results gathered therefrom were "minimal." Smith admitted that he had never visited Allied's plant, had never conducted any tests at the plant, and had never made visual observations of the plant during his year of work at the Agency.

The Agency's engineer was recalled as a witness upon cross-examination, and he testified that on December 27, 1971, he had observed visible fumes emanating from Allied's plant, but that he did not take an "opacity" test or a "Ringelmann" test that day; that upon his next visit to the plant on September 22, 1972, he had observed smoke emitting from the plant and that he determined the visual opacity reading to be 45%; and that from the time of his first visit to the Allied plant to the time of the hearings below, he had made no field type instrument measurement test and no stack tests.

## I.

■■ In *Brown Shoe Co. v. Gordon* (1950), 405 Ill. 384, 392, 91 N.E.2d 381, our supreme court stated that "* * * administrative decisions must be upheld by courts unless manifestly against the weight of the evidence." The enunciated principle has been found by this court to apply to proceedings before, and decisions emanating from, the Pollution Control Board. (*Rhodes v. Pollution Control Board* (4th Dist. 1972), 8 Ill.App.3d 74, 289 N.E.2d 61.) We are compelled, therefore, to leave the Board's decision in the matter at hand as we find it, unless we find the decision to have been against the manifest weight of the evidence presented at the hearings before the Board.

## A.

First of all, regarding the alleged permit regulation violation pursuant to section 3—2.110 of the Rules, we find from a review of the record that the evidence, which was uncontroverted, established that the construction of the two zinc pots was under way in December, 1971, and that Allied had not procured the appropriate permit for the construction of same.

Section 3—2.110 was in effect and binding on Allied at the time of construction. This section clearly sets forth that permits are required for all equipment capable of emitting an air contaminant. Section 1 of the Rules and Regulations defines "air contaminant" as "Particulate matter, dust, fumes, gas, mist, smoke or vapor, or any combination thereof."

■■ The sole argument raised by Allied on this point is to the effect that it never considered the two pots as viable emission sources, in that

they would emit a trifling amount of pollutants into the atmosphere; thus, they concluded of their own accord that a permit was unnecessary. We do not agree with that conclusion, and we uphold the decision of the Board with respect to its finding on this issue.

## B.

With regard to the section 9(a) violations as charged in the complaint, the Board, in its order, set forth a summary of the testimony of the Agency's two lay witnesses as well as of Allied's two lay witnesses. The order then stated the Board believed the Agency's proof sufficient to establish a violation of section 9(a). Thus, it might be said that the Board's order was not against the manifest weight of the evidence, as the Board interpreted the conflicting evidence.

It is Allied's contention on appeal that the Board by its decision has set a standard of proof which is so minimal that it amounts to a burden upon Allied before the Board to prove that they are not in violation of the Act. Allied maintains that the evidence presented before the Board regarding the section 9(a) violations did not demonstrate its non-compliance with the Act, and it calls our attention to many points in support of its argument: The Agency's engineer failed to perform any tests on December 27, 1971, either of the opacity or the Ringelmann[2] variety; the engineer, in taking his opacity test on September 22, 1972, which resulted in a 45% opacity reading, failed to consider the smoke and fumes emanating from the diesel engines on railroad tracks adjoining Allied's plant, from diesel-powered barges plying the adjoining river, from the vehicular traffic on Canal Street, and from other industrial plants in the area; the engineer failed to detect odors on either the December, 1971, visit or in September, 1972; the engineer's testimony reflects doubtful credence in several other regards; and the workmen who testified on the Agency's behalf at no time complained to the Agency nor to physicians concerning their alleged afflictions, and both admitted that smoke and fumes emanated from other sources in the areas of their employ.

Regarding the alleged particulate emission violations under section 9(a) and section 3—3.111 (Limitations of Processes) of the Rules, the evidence of the Agency, based on the application of a generic theoretical formula to Allied's processing data, demonstrated an actual excess emis-

---

[2] The Ringelmann test referred to is described as follows in the Rules and Regulations Governing the Control of Air Pollution: "RINGELMANN CHART—The chart published and described in the Bureau of Mines, U.S. Department of Interior, Information Circular 8333 or as revised, and on which are illustrated graduated shades of gray to black for use in estimating the apparent density of smoke."

sion of 11.63 excess pounds per hour. Allied on the other hand contends that its evidence, based in part on its modified stack test, demonstrated a maximum emission rate between 5.36 and 8.2 pounds per hour, well below the allowable emissions.

Further, with respect to the particulate emission issue, we conclude the Board's finding is against the manifest weight of the evidence for the following reasons: Because it is based upon the application of a generic theoretical formula applied to Allied's processing data without any evidence that the said formula remains applicable in the face of the unusual specific circumstance of the exceptional height of Allied's plant, a circumstance which becomes highly relevant in view of the testimony of the "settling chamber" effect, even as offset by the "lofting effect" of Allied's roof fans; *and* this evidence based on the formula is controverted by evidence of an actual, specific stack test made by Allied, which evidence—though countered by a sharp scientific attack on the methodology used—is yet not countered by evidence of any specific Agency stack test.

■■ We have fully and carefully reviewed the totality of the evidence with respect to the section 9(a) violations, and it is our conclusion that the findings made by the Board were insufficient to support the determination by the Board that Allied was guilty of the statutory violations charged.

We turn now to a different matter. Section 33(c) of the Act, which relates both to violations of the Act as well as to violations of Agency Rules and Regulations, reads, in pertinent part:

"(c) In making its orders and determinations, the Board shall take into consideration all the facts and circumstances bearing upon the reasonableness of the emissions, discharges or deposits involved including, but not limited to:

(i) the character and degree of injury to, or interference with the protection of the health, general welfare and physical property of the people.

(ii) the social and economic value of the pollution source;

(iii) the suitability or unsuitability of the pollution source to the area in which it is located, including the question of priority of location in the area involved; and

(iv) the technical practicability and economic reasonableness of reducing or eliminating the emissions, discharges or deposits resulting from such pollution source." *Ill.* Rev. Stat. 1971, ch. 111½, par. 1033(c).

We have scrutinized thoroughly the order entered by the Board, and we find that the order reflects none of the considerations of the "reason-

ableness" factors which are mandated by section 33(c). The Board made no finding with regard to the character and degree of injury to, or interference with, the protection of the health, general welfare, and physical property of the people; no finding regarding the social and economic value of the pollution source, Allied's plant; no finding as to the suitability or unsuitability of Allied's plant to the area in which it is located; and no finding with respect to the technical practicability and economic reasonableness of compelling Allied to reduce or eliminate the emissions from its plant.[3]

In cases such as these, where the evidence could be voluminous and highly technical, the mandate of section 33(c) is crucial in several ways: It insures the integrity of the proceedings before the Board, as well as the Board's decision; it serves to guide both respondents before the Board and the Agency itself; and it provides this court with data necessary to a complete and fair review of the administrative decision by the Board. Without such information, in matters of this type, a thorough and judicious review of the decision cannot be made. See *Maywood Park Trotting Association, Inc. v. Illinois Harness Racing Commission* (1959), 15 Ill.2d 559, 563, 155 N.E.2d 626.

■■ It is to be noted that section 33, which deals with Board determinations and orders, provides, among other things, in subsection that (a) "* * * the Board shall file and publish a written opinion stating the facts and reasons leading to its decision." It is our opinion that sections 33(a) and (c) are intended to require the Board to set out in its order specified findings as to the matters itemized in section 33(c).

■ We find, therefore, that the order of the Board in the instant case does not substantially comply with the findings requirement of section 33(c) (Ill. Rev. Stat. 1971, ch. 111½, par. 1033(c)).

In arriving at our conclusion on this issue, we were not unaware of the holdings in *Ford v. Environmental Protection Agency* (3d Dist. 1973), 9 Ill.App.3d 711, 292 N.E.2d 540, and *Airtex Products, Inc. v. Pollution Control Board* (5th Dist. 1973), 15 Ill.App.3d 238, 303 N.E.2d 498. However, both of those cases involved circumstances dissimilar to those presented here.

In both *Ford* and *Airtex Products*, the orders therein were found to have contained sufficient findings in respect of violations of section 9(a) to adequately support prima facie the orders rendered by the respective boards. In the case at bar, the Board's order does not contain sufficient

---

[3] There is evidence in the record which was sufficient to enable the Board to make findings as to each such factor and then, by a balancing of the respective factors, to make its overall finding as to the reasonableness of the smoke and particulate emissions.

findings to adequately support the order. In *Ford* the Agency's evidence made out a prima facie case to support the violation findings and order of the Board and the burden of going forward shifted to Ford, who apparently did not offer any evidence to the issue of the reasonableness of the emissions. Therefore the court did not believe a specific determination need be set forth by the Board as to the factors of section 33(c). On the other hand, in the instant case the evidence was contested and Allied presented evidence relating to the "reasonableness" factors after the burden of going forward had shifted from the Agency to Allied. Under such circumstances the Board's findings under section 33(c) would become a significant basis in the resolution of this matter.

Moreover, in *Ford*, the court, in sustaining the claim that the Board did not have to find the specific determinations as to each of the "reasonableness" factors set forth in said section 33(c), appears to rely on *United Cities Gas Co. v. Illinois Commerce Commission* (1970), 47 Ill. 2d 498, 265 N.E.2d 608. In *United*, the supreme court held, at page 501:

> "It is true that the Commission's order did not make a finding on each of the issues in controversy. We have held, however, *that it is not necessary to make a particular finding as to each evidentiary fact or claim. (Chicago Junction Railway Co. v. Illinois Commerce Com.*, 412 Ill. 579; *Chicago, Burlington and Quincy Railroad Co. v. Commerce Com. ex rel. Brotherhood of Railroad Trainmen*, 364 Ill. 213.) The commission made sufficient findings to support the order and those findings had a substantial foundation in the evidence." (Emphasis supplied.)

We believe the statutory language of section 33(c) sets out certain matters deemed by the legislature of such significance that certain fundamental elements were minimally required. See *Maywood Park Trotting Association, Inc. v. Illinois Harness Racing Commission, supra.* In our opinion this statutory language goes beyond "a particular finding as to each *evidentiary fact or claim.*"

## II.

■■ The final issue, whether the Board possessed the power to impose a fine for violations of the Act, has recently been considered by our supreme court in *City of Waukegan v. Pollution Control Board* (1974), 57 Ill.2d 170, 311 N.E.2d 146, wherein it was held that the Board possesses such authority. Consequently, we need not say more concerning this aspect of the appeal.

## III.

However, in view of our decision to overturn the order of the Board with respect to the section 9(a) and section 3—3.111 violations, we must

consider the propriety of the imposition of the $2,500 penalty as it relates to the Board's finding that Allied violated section 3—2.110 of the Rules, the permit regulation section. It is clear from a reading of the order imposing the penalty that the same was imposed by the Board based upon its findings that Allied had violated section 9(a) of the Act, and sections 3—3.111 and 3—2.110 of the Rules; that is, the fine imposed was not specific in dollar amount as to each violation found to have been committed by Allied. It is therefore ordered that the $2,500 fine is reversed and that this cause is remanded to the Board for the sole purpose of considering the fine, if any, to be imposed by the Board; and if such is to be imposed, then the fine shall be no more than $2,500.

In summary, then, we find:

1) that the evidence is insufficient to support the Board's findings with respect to the section 9(a) and section 3—3.111 violations, thus the order of the Board as to these sections is vacated;

2) that the Board's findings with respect to the section 3—2.110 violation was supported by the evidence and the order of the Board as to this section is affirmed;

3) that the penalty of $2,500 is vacated; and

4) that the cause is remanded and the Board is to consider the penalty, if any, regarding the section 3—2.110 violation.

The order of the Board affirmed in part, vacated in part and remanded in part.

HAYES, P. J., and STAMOS, J., concur.