AURORA METAL COMPANY-FASKURE DIVISION, PETITIONER, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.

(No. 73-221;

Second District (2nd Division)—August 1, 1975.

Reid, Ochsenschlager, Murphy & Hupp, of Aurora (Robert B. Hupp and John M. Lamont, of counsel), for petitioner.

William J. Scott, Attorney General, of Chicago (Douglas T. Moring, Thomas J. Immel, and Richard W. Cosby, Assistant Attorneys General, of counsel), for respondents.

Mr. PRESIDING JUSTICE RECHENMACHER delivered the opinion of the court:

This is a statutory review, pursuant to the Environmental Protection Act and the Administrative Review Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1041; ch. 110, par. 264 *et seq.*) of an order entered by the Pollution Control Board (Board).

The Environmental Protection Agency (Agency) filed a complaint charging that Faskure Division of Aurora Metal Company (Faskure), had violated section 9(a) of the Environmental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1009(a)) in causing air pollution by the discharge of "phenolic odors" and "sand particles and grindings" from its plant in Aurora, Illinois, so as "to unreasonably interfere with the enjoyment of life or property". The complaint requested a cease and desist order and the assessment of a penalty for such violation. Faskure's answer denied the charges and raised an affirmative defense of compliance with the Agency's Air Pollution Control Regulations, particularly Rule 801 *et seq.* and Rule 203. Prior to the hearing the Agency admitted that it did not contend that Faskure was in violation of those regulations.

The Board found that Faskure had violated section 9(a) of the Act in causing air pollution by the emission of phenolic odors and particulates "in unreasonably interfering with the enjoyment of life or property and being injurious to human health," fined it $1,000 and ordered Faskure to submit within 30 days a program of compliance to be approved by the Agency, together with a $25,000 performance bond guaranteeing installation of equipment, and compliance accordingly, "which bond shall provide for a penalty in the amount of $10,000 in the event [Faskure] fails to cause reduction of its particulate  *  *  *  and odor emissions to an extent where they shall no longer constitute a violation of Section 9(a) within" 60 days as to particulate emissions and 9 months as to phenolic odor emissions.

Faskure is a manufacturer of resin coated sand used in the foundry industry and has been operating at its present location since 1959. Its plant is located in a heavily industrialized quarter of the southern edge of Aurora and is zoned M-1, Manufacturing District. Other zonings in the area are M-2, Manufacturing, and R-4, Residential. There are some residential homes in the area, and several factories besides Faskure, including Landgraf Furniture, Airco Welding, and Georgia-Pacific. To the north of Faskure's plant, separated by the main line of the Burlington

Railroad, is Meyer Material Co., a cement and concrete mix plant which stores sand in uncovered piles on its property. All of the land west of Faskure's plant is vacant.

The Agency presented the testimony of six resident neighbors and two expert engineers employed by the Agency. The engineers expressed no opinion as to whether Faskure was in violation of the Act. Four of the neighbors testified to dust and grit from Faskure's plant. One of them said the dust came from Faskure and Meyer Material but she could not tell the difference. All of the Agency's neighbor witnesses testified to the phenolic odors. Such odor is noticeable on "still days", when there is a temperature inversion; one witness said it smelled like carbolic acid and that it caused a burning sensation; another said it "sort of" seared her throat; still another noticed it "in excess of" 10 times in the past years and associated the smell with a disinfectant. To another it smelled like glue or paint; and to yet another like Lysol. The Agency's expert, Mr. Zenisek, did not detect the phenolic odor until he got downwind from the plant, and stated that while it was "objectionable" it was "not sickening", and he could not detect any odor from the homes of the three complaining witnesses. The Agency's expert, Mr. Rosenthal, detected "intermittent phenolic odors" while downwind of the plant.

Faskure's expert, Dr. Aynsley, testified that he detected phenolic odors on the roof during stack tests but did not recall smelling it at ground level. He testified, however, that under extreme meteorological conditions ("low level inversion, higher humidity") which occurs only one percent of the time, the odor was detectable in "residences around the plant property lines"; but that the odors are not of such character and quantity as to be injurious to human, animal or plant life.

Mr. Zenisek took dust samples from the front of one of the complaining neighbors' homes to substantiate the fact that the dust came from Faskure. But those samples were lost or misplaced and no report on their analyses was produced.

Faskure called as an adverse witness a Mr. Wennmacher, the first Agency engineer directed to investigate the complaint. He testified that in his opinion, after a thorough investigation, Meyer Material "may be the real cause" of the complaint about sand and dust. The Meyer plant is nearest to those neighbors complaining about dust and grit.

There was also testimony that some of the sand particles and dust problems were caused by trucks owned by an independent carrier, Beck Transport Co., which delivered sand to Faskure in pneumatic conveyor trucks so as to avoid sand spillage. The drivers of those trucks, to speed completion of unloading, may have speeded up the unloading pressure which results in clouds of dust. However, the record does not establish

what was the cause. When Faskure learned of that condition in October of 1972, it immediately terminated Beck's services. The Board's opinion found:

> "In the present case, establishment of violation is all the more difficult because while not controlling in instances of this sort, Respondent has performed stack tests which indicate, at least so far as the particulate emissions are concerned, that the operation is not in violation of the relevant Regulations.
>
> Likewise, its rebuttal evidence with respect to phenol emissions demonstrate quantities that, if extrapolated to Respondent's property line, might suggest that the odor emissions are not of a level to constitute an odor nuisance. However, we do not find the evidence sufficient to warrant such conclusion. Accordingly, while Respondent may have established a prima facie defense, it still becomes necessary to examine the record to ascertain what the subjective impact on the community has been of both the particulate emissions and the odor emissions to ascertain whether, in fact, a Section 9(a) violation has been established."

Two residential neighbors testified on behalf of Faskure that they were not bothered either by dust or odors from Faskure's plant.

The evidence also shows that beginning in the year 1961, Faskure, being concerned about eliminating dust, retained a consulting engineer to evaluate the problem, and spent large sums of money in installing equipment to control it. In 1972, Faskure used 48 percent of its total capital expenditure budget for environmental protection or implementation of the Health and Safety Act. For the year 1973, Faskure allocated $80,000 of a total budget of $120,000 for additional equipment for "control of dust, odor and so on."

In its opinion and order the Board, in referring to the subjective testimony as to unreasonable interference with the enjoyment of life, stated:

> "As in most cases of this sort, the testimony is conflicting, the odors as alleged as a basis of violation are difficult of identification and subjective interference with the enjoyment of life is often a matter of opinion."

After reviewing the testimony the Board determined that it established "both an odor and particulate nuisance * * * and that Section 9(a) has been violated." The Board also held Faskure liable for the pollutional discharges of sand by the independent contractor, Beck Transport Co.

Faskure contends that the Board failed to comply with standards established by section 33 of the Act. Section 33(c) states:

> "In making its orders and determinations, the Board shall take into consideration all the facts and circumstances bearing upon

the reasonableness of the emissions, discharges, or deposits involved including, but not limited to:

(i) the character and degree of injury to, or interference with the protection of the health, general welfare and physical property of the people;

(ii) the social and economic value of the pollution source;

(iii) the suitability or unsuitability of the pollution source to the area in which it is located, including the question of priority of location in the area involved; and

(iv) the technical practicability and economic reasonableness of reducing or eliminating the emissions, discharges or deposits resulting from such pollution source." Ill. Rev. Stat. 1971, ch. 111½, par. 1033(c)(i), (ii), (iii), (iv).

■■ The Board's opinion in the case at bar indicates that the only category of the criteria expressly specified in section 33(c) which it considered upon reasonableness of the emissions, discharges or deposits was category (i). Categories (ii), (iii) and (iv) were not mentioned at all as having been considered in compliance with that section. Indeed, the Agency offered no evidence whatever as to categories (ii) and (iii). As to category (iv), in commenting on such evidence as was introduced concerning the sincere effort Faskure was planning to make to reduce or eliminate the emissions, the Board merely observed in the opinion that "[t]his work, if successful would eliminate the phenolic odor problem but seemingly might create a new odor problem". Having failed to introduce evidence on each of the criteria of section 33(c), the Agency failed to meet its burden of proof. (*Incinerator, Inc. v. Pollution Control Board*, 59 Ill.2d 290, 299-300.) It is therefore obvious that the Board failed to take into consideration the various factors bearing upon reasonableness. The Agency having failed to meet its burden of proof of showing that Faskure has caused air pollution by the discharge of odors as required by *Incinerator* and section 31 of the Environmental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1031(c)) and having failed to introduce any evidence whatever on two of the categories, the Board's order will be reversed. (*Processing and Books, Inc. v. Pollution Control Board*, 28 Ill. App.3d 115.) In reaching this conclusion we have fully considered *Mystik Tape v. Pollution Control Board*, 60 Ill.2d 330. However, in that case it appears that some evidence had been introduced as to all the necessary factors and the Illinois Supreme Court reversed and remanded the proceedings to the Board for the taking of additional evidence, if either party deemed it advisable. In the case at bar no evidence was introduced as to some of the factors.

Although our holding renders it unnecessary for us to do so, we are impelled to comment on other errors committed by the Board in this case.

■■ The Board's holding that Faskure was responsible for particulate emissions caused by Beck Transport Co., an independent contractor, has no support in the record or in law. The operation of the trucks by Beck was not done under the supervision of any Faskure personnel. As soon as it came to Faskure's attention in October of 1972, Faskure terminated Beck's services. Faskure cannot be held liable for Beck's actions in the absence of evidence that Faskure failed to exercise reasonable care in selecting Beck to perform that service. (See *Gomien v. Wear-Ever Aluminum, Inc.*, 50 Ill.2d 19, 21.) There is no such evidence in this case.

We now consider whether the Board is authorized to require submission of a penal bond, in addition to a performance bond, as it did here. The Board's order stated as follows:

> "Upon approval  *  *  *  by the Agency [of a program to assure compliance with certain conditions of the order], Respondent shall submit  *  *  *  a bond in the amount of $25,000, guaranteeing installation of the equipment and compliance with all conditions as set forth in this paragraph, which bond shall provide for penalty in the amount of $10,000 in the event Respondent fails to cause reduction of its particulate emissions and odor emissions to an extent where they shall no longer constitute violations of Section 9(a) within the time periods hereinabove set forth."

Section 33(b) of the Environmental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1033(b)) provides in pertinent part that "the Board may require the posting of sufficient performance bond *or other security* to assure the correction of such violation within the time prescribed." (Emphasis supplied.)

■■ The Agency concedes that the additional bond is a "penal bond" but argues that it is permissible within the terms of "or other security." There might have been some merit to the Agency's argument had the legislation given an authorization for the imposition of a performance bond "and other security." However, the language used makes it clear that what was intended to be authorized was only a "performance bond or other security" for *performance*. We therefore hold that the Board has no authority to require the submission of a penal bond in addition to a performance bond.

Because of the Agency's failure to introduce any evidence on three of the criteria specified in section 33(c) and the Board's subsequent failure to consider each criterion as required by law, the order of the Board is reversed.

Order reversed.

T. MORAN and DIXON, JJ., concur.