TRI-COUNTY LANDFILL COMPANY, Petitioner, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.—EVERETT VAN DER MOLEN *et al.*, d/b/a Elgin Landfill Company, Petitioners, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.

Second District (1st Division)   Nos. 73-161, 73-167 cons.

Opinion filed August 5, 1976.

Robert F. Casey, of Geneva, and Murphy & Pearson, of Chicago, for petitioners.

William J. Scott, Attorney General, of Chicago, and Jordan & Miles, of Elgin (James I. Rubin, Richard W. Cosby, and Russell R. Eggert, Assistant Attorneys General, of counsel), for respondents.

Mr. JUSTICE HALLETT delivered the opinion of the .court:

After extended hearings, briefs and argument, the Illinois Pollution Control Board found two landfill companies (Elgin and Tri-County) who operate landfills northeast of the village of South Elgin, guilty of violating section 12 of the Environmental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1012) and ordered them (1) to cease and desist from causing water pollution and the threat of water pollution at their respective sites; (2) to take immediate steps to terminate leachate and pollutional discharge from their sites, to submit programs for abatement within 90 days and to effectively implement such programs within 180 days; (3) each to post a bond of $100,000 guaranteeing the submission of such a program, the bond also to provide for a forfeiture of $20,000 for any failure effectively to abate the discharge within 180 days; and (4) each to pay a penalty of $10,000 for said violations.

Elgin and Tri-County appeal and contend, in substance, (1) that the Board exceeded its statutory power in declaring private waters to be "waters of the State"; (2) that the Environmental Protection Agency and the Board are both estopped from asserting or holding that actions taken by the landfill operators violate the Act; (3) that there is no substantial evidence to support the Board's finding that there is a threat of water pollution in the operation of the landfills; and (4) that the Board erred in levying fines against them. We reverse only so much of the Board's order as purports to impose present and future penalties but affirm the Board's order in all other respects.

The landsites in question lie to the northeast of the village of South Elgin. Site A (as it was referred to in the proceedings) is owned by the Van der Molens, d/b/a Elgin Landfill Company (hereinafter referred to as Elgin). It consisted of 20 acres and had been in operation as a solid waste disposal landfill since 1961. Site B is south and immediately contiguous to Site A. Tri-County Landfill has been operating a solid waste disposal landfill on it since April, 1968. Site C consists of 235 acres of land located to the west of the existing two landfills A and B, and is separated from them by the Chicago, Aurora and Elgin Railroad right-of-way. The village of South Elgin lies immediately northwest of Site C. West of the village lies the Fox River.

Site C is owned by Arc Disposal Company, Garden City Disposal Company and Tri-County. The owners had intended to use Site C for landfill purposes when Site B was completed. However, in 1972, they were denied permission by the Environmental Protection Agency to use it because such use would be in violation of the County zoning laws, although the permit in 1970 had allowed Site C to be used for landfill purposes subject to zoning laws. Site C contains two bodies of water designated Pond II and Pond III (which were part of a lake before a dam on the stream leading to the Fox River broke) and a stream.

Beneath the existing and proposed landfill sites lie two additional bodies of water, an upper aquifer found in the upper 15-30 feet of soil and a lower aquifer found beneath but apparently separated from the upper aquifer by a layer of clay. The water in the upper aquifer moved through Sites A, B and C in a southwesterly direction towards the Fox River. The source of a portion of the water in the ponds on Site C is ground water from the upper aquifer which percolates through the soil into the ponds. The second, deeper and larger aquifer also flows in a westerly or southwesterly direction. It serves as a source of South Elgin's water supply. The South Elgin well is located about 500 feet west of Site C.

The initial complaint was filed against the petitioner Tri-County Landfill Company and its manager alleging certain pollution violations. Subsequently, Elgin and certain other parties subsequently dismissed

were joined as respondents. The village of South Elgin, the Environmental Protection Agency and certain citizens were granted leave to intervene as party complainants.

Hearings on the matter commenced on June 23, 1971, and concluded on February 7, 1973. Final arguments were made directly to the entire Board. The Board found that (1) the two disposal companies (owners of Site C) who had been joined had committed no violation and they were dismissed; (2) there was no violation of any regulations or statutes with regard to air pollution; (3) while the evidence demonstrated the probability that the Rules and Regulations with respect to Refuse Disposal Sites and Facilities had been violated on an episodal basis, the evidence was not sufficiently impressive to establish violations with the exception of Rule 402(a) which requires that reasonable assurance be taken so that leachate from the landfill does not contaminate the ground waters or streams in the area; (4) Elgin and Tri-County Landfill were guilty of causing water pollution, in violation of section 12(a) of the Act, and of causing a water pollution hazard, in violation of section 12(d) of the Act. The Board did not find that the lower aquifer was presently polluted. It did find that Ponds II and III and the stream flowing from them had been polluted by the landfill operations. It, however, found the threat of water pollution inherent in the present operations to be more significant. As stated by the Board:

"There was considerable testimony and dispute as to whether the upper and lower aquifers were separated by an impervious clay layer. Testimony both pro and con in this respect was particularly speculative. However, there is no question that the lower aquifer runs beneath Sites A, B and C and provides the water supply for the City of South Elgin. There is also no question that portions of the upper aquifer, the ponds on Site C and the stream connecting and running therefrom to the Fox River have been polluted. We must, therefore, conclude that a substantial threat of water pollution to the lower aquifer exists as a consequence of the pollutional discharges from Respondents' properties * * *.

The evidence establishes that if, in fact, drinking water becomes characterized by the TDS counts that are present in the portions of the upper aquifer, this could have been a serious and disastrous effect on the citizens of South Elgin. We will not tolerate this danger, notwithstanding the fact that the time may be distant when such pollution would, in fact, take place."

Accordingly, the Van der Molens and Tri-County were ordered to cease and desist from causing water pollution and the threat of water pollution, to take immediate steps to terminate leachate and pollutional

discharge from their sites; to submit a program for abatement within 90 days and to effectively implement the program within 180 days; to each post a bond of $100,000 to guarantee submission of a program, the bond also providing for a forfeiture of $20,000 for any failure to effectively abate the discharge within 180 days and to pay a penalty of $10,000 each.

The parties appealed separately. However, we have consolidated the appeals for purpose of this opinion, although not all issues were raised by both parties.

The first issue before this court is whether the Board had jurisdiction over the waters in question. The Board found the petitioner guilty of causing water pollution and depositing contaminants so as to create a water pollution hazard; but Petitioner Tri-County contends that such pollution even if it exists is not a violation of the Environmental Protection Act. Water pollution is defined by section 3 of the Environmental Protection Act (Ill. Rev. Stat. 1973, ch. 111½, par. 1003) as:

> "* * * such alteration of the physical, thermal, chemical, biological or radioactive properties of any waters of the State, or such discharge of any contaminant into any waters of the State, as will or is likely to create a nuisance or render such waters harmful or detrimental or injurious to public health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational, or other legitimate uses, or to livestock, wild animals, birds, fish, or other aquatic life."

Tri-County contends that waters on private land are not "waters of the State." It argues that before the waters can be waters of the State, they must be shown to be navigable for useful commerce.

■■ The term "waters of the State" could, in a sense, mean waters belonging to the State. Or it can simply mean waters located within the State. And in determining which meaning should be given to the statutory provision, we should look at the whole Act and the purpose for which it was enacted. *Ford v. Environmental Protection Agency* (1973), 9 Ill. App. 3d 711, 292 N.E.2d 540; 34 Ill. L. & Pr. *Statutes* §123 (1958).

Section 11 of the Act states that:

> "(a) The General Assembly finds:
> (i) that pollution of the *waters of this State* constitutes a menace to public health and welfare, creates public nuisances, is harmful to wildlife, fish, and aquatic life, impairs domestic, agricultural, industrial, recreational, and other legitimate beneficial uses of water, depresses property values, and offends the senses."

(Emphasis added.) (Ill. Rev. Stat. 1973, ch. 111½, par. 1011.)

It is doubtful that the legislature believed that wildlife is so discriminating that pollution of navigable waters would be harmful to them but pollution of non-navigable waters would not. And certainly stagnant water

privately owned may constitute a menace to public health through the breeding of disease. Thus in this sentence the words "waters of the State" would appear to mean waters located within the State.

■■ That section continues by stating:

"(b) It is the purpose of this Title to restore, maintain and enhance the purity of the waters of this State in order to protect health, welfare, property, and the quality of life, and to assure that no contaminants are discharged into *the waters of the State, as defined herein*, including, but not limited to, waters to any sewage works, or into any well, or from any source within the State of Illinois, without being given the degree of treatment or control necessary to prevent pollution, or without being made subject to such conditions as are required to achieve and maintain compliance with State and federal law; and to authorize, empower, and direct the Board and the Agency to adopt such regulations and procedures as will enable the State to secure federal approval to issue NPDES permits pursuant to the provision of the Federal Water Pollution Control Act Amendments of 1972 (P.L. 92—500) and federal regulations pursuant thereto." (Emphasis added.)

Again, it would appear clear that the intent of the legislature was to enact sweeping legislation covering all sources of pollution both public and private. Furthermore, the legislature in this section refers us to the definitions, which are found in section 3 (Ill. Rev. Stat. 1973, ch. 111½, par. 1003). Only "waters" is defined and it is defined to mean "all accumulations of water, surface and underground, natural, and artificial, public and private, or parts thereof, which are wholly or partially within, flow through, or border upon this State."

It is interesting to note that the Federal Water Pollution Control Act is equally wide sweeping in its language enjoining the Administrator to prepare or develop comprehensive programs for preventing, reducing or eliminating the pollution of "the navigable waters and ground waters and improving the sanitary condition of surface and underground waters."

Since the waters polluted by the petitioner were "waters of the State," Tri-County's contention that if the Board could exercise jurisdiction over the waters at all it could do so only by regulation is without merit. While the Board may promulgate regulations, it is not required to do so. It may choose instead to develop standards in the course of case by case enforcement proceedings. *W. F. Hall Printing Co. v. Environmental Protection Agency* (1973), 16 Ill. App. 3d 864, 306 N.E.2d 595; *Mystik Tape v. Pollution Control Board* (1973), 16 Ill. App. 3d 778, 306 N.E.2d 574, *aff'd in pt., rev'd in pt.*, 60 Ill. 2d 330, 328 N.E.2d 5.

■■ Both petitioners next contend that the board and the agency are

estopped from asserting that the petitioners' activities violated the Act since the Agency's predecessor approved the landfill sites. Furthermore, this agency in its letters to Tri-County through March 24, 1971, indicated the operation was satisfactory; "the manner of performance was done as it was authorized to be done; therefore, the doctrine of estoppel must be applied." The complainants contend that the doctrine of estoppel is not applicable because (1) there was no compliance with the requirement of the permit that leachate from the waste disposal site be collected and adequately treated in accordance with Sanitary Water Board criteria, but instead natural attenuation has been relied upon; and (2) the permit also provided that it did not release the permittee from compliance with other applicable statutes of the State of Illinois or with the applicable local laws, regulations or zoning ordinances. We are inclined to agree.

However, there is a much more basic reason why the doctrine of estoppel cannot be applied here. To allow estoppel here would be to permit the people of Illinois to be denied their constitutional right to a healthful environment (Ill. Const., art. XI, §2), because of the actions of certain State officials.

"[A]n estoppel in this situation is not appropriate for the reason that there is involved a public right and the protection of the public. As was said in C.J.S. Volume 31, Section 138 at page 675:

'Estoppels against the public are little favored. They should not be invoked except in rare and unusual circumstances, and may not be invoked where they would operate to defeat the effective operation of a policy adopted to protect the public.'

In cases involving public revenue, public rights and the exercise of governmental functions, estoppel against the State has been denied (*People ex rel. Paul Powell v. Luttrell*, 264 N.E.2d 737; *Todd v. Annunzio*, 410 Ill. 343, 102 N.E.2d 297 and *Lincoln Park Traps v. Chicago Park District*, 323 Ill. 107, 55 N.E.2d 173.) In the case of *Hickey v. Illinois Central R.R. Co.*, 35 Ill. 2d 427, 220 N.E.2d 415, the Supreme Court did find an estoppel against the State when acting in a proprietary function, as against a governmental function. The court therein points out that there may be estoppel against the State when operating in a governmental capacity but only under compelling circumstances. In explaining the hesitancy of the courts to apply estoppel to public bodies, the court stated on page 447:

'There are sound bases for such policy. It is said that since the State cannot be sued without its consent, an inevitable consequence is that it cannot be bound by estoppel. More importantly, perhaps, is the possibility that application of

*laches* or estopped doctrines may impair the functioning of the State in the discharge of its government functions, and that valuable public interests may be jeopardized or lost by the negligence, mistakes or inattention of public officials.'

In this case, the court is involved with a matter of the rights of the public and a statutory proscription. The mere registration of the defendant is not sufficient to justify the curtailing of the police powers of the State and preventing the State from proceeding to remedy a continuing violation of the statutory provisions of the Solicitation Act. To hold otherwise would effectively curtail the power and the right of the State to enforce public rights when mistakes or errors in judgment of those acting in an official capacity appear."

*People ex rel. Brown v. Illinois State Troopers Lodge No. 41* (1972), 7 Ill. App. 3d 98, at pages 104, 105, 286 N.E.2d 524, *leave to appeal denied*. To allow an estoppel here would also mean that progress in pollution control would be barred by the procedures of the past. No new techniques could be required because in the past less efficient ones were approved. The questions of good faith compliance as raised by Tri-County is relevant to the issue of penalties but it is not relevant to the issue of whether there was a violation of the Act. See *Freeman Coal Mining Corp. v. Pollution Control Board* (1974), 21 Ill. App. 3d 157, 313 N.E.2d 616; *Meadowlark Farms, Inc. v. Pollution Control Board* (1974), 17 Ill. App. 3d 851, 308 N.E.2d 829, *leave to appeal denied* (the Act is a *malum prohibitum* and no *mens rea* is necessary to a finding of guilt).

The petitioners rely on *Wachta v. Pollution Control Board* (1972), 8 Ill. App. 3d 436, 289 N.E.2d 484, *leave to appeal denied*, decided by this court. That case and the two succeeding cases, *Bederman v. Pollution Control Board* (1974), 22 Ill. App. 3d 31, 316 N.E.2d 785, and *Kaeding v. Pollution Control Board* (1974), 22 Ill. App. 3d 36, 316 N.E.2d 788, while holding the Board estopped from revoking a permission previously granted the landowners to connect to the North Shore Sanitary District after the landowners had incurred considerable expense in reliance on the permits, did not involve the question of pollution. Indeed, in *Kaeding v. Pollution Control Board*, this court specifically pointed out that the Board had found that none of the defendants including Kaeding had violated the Environmental Protection Act.

As to Elgin, moreover, it was on notice after December 7, 1970, that the Agency was of the opinion that Elgin was violating its permit by allowing leachate to escape from its premises. For on that date the agency wrote Elgin stating:

"Leachate from your site is flowing into nearby ponds and other waterways. Sample results from previous inspections show that

this leachate is grossly polluted; this water must be treated before allowing it to flow from your property."

The berm required by the Agency has never been constructed.

■■■ Elgin protests that the requirement of remedying the alleged harm caused by the landfills is an *ex post facto* punishment. But, of course, there is no "punishment" in requiring a person to remedy injuries he has inflicted on another. Moreover, the *ex post facto* prohibition of the Federal and Illinois constitutions is only applicable to criminal sanctions. (11 Ill. L. & Pr. *Constitutional Law* §325 (1955).) Nor does the order affect the vested rights of Elgin. No one even in the pursuit of an otherwise lawful business ever acquires a vested right to create or maintain a nuisance in connection therewith, (*Dube v. City of Chicago* (1955), 7 Ill. 2d 313, 326, 131 N.E.2d 9, *cert. denied*, 350 U.S. 1013, 100 L. Ed. 873, 76 S. Ct. 658) and reasonable restraints on the use of property in the interest of the common good and bearing a real and substantial relation to public health constitute a valid exercise of police power. (*Midland Electric Coal Corp. v. County of Knox* (1953), 1 Ill. 2d 200, 115 N.E.2d 275.) Moreover, contract rights are subject to reasonable and legitimate exercise of police power by the State. (*Meegan v. Village of Tinley Park* (1972), 52 Ill. 2d 354, 288 N.E.2d 423.) Nor is the application of the act in this case retroactive since although the landfill existed before the enactment of the act, refuse has been added to it after July 1, 1970, the effective date of the act and the polluting discharges occur presently. *Freeman Coal Mining Corp. v. Pollution Control Board* (1974), 21 Ill. App. 3d 157, 313 N.E.2d 616.

■■ Both petitioners also contend that the Board's findings that they caused water pollution and that a water pollution hazard was created are not supported by the evidence. Administrative decisions must be upheld by the courts unless manifestly against the weight of the evidence. (*Allied Metal Co. v. Pollution Control Board* (1974), 22 Ill. App. 3d 823, 318 N.E. 2d 257, *leave to appeal denied*.) The Board had before it over 3,000 pages of testimony and arguments which it carefully weighed and summarized in its opinion. To set forth all of this evidence would not only unduly prolong the opinion but would have no precedential value. Suffice it to say, there was more than substantial evidence to support the finding that the petitioner has caused in whole or in part the pollution of the surface waters on Site C.

However, the finding of a water pollution hazard involves more than a mere finding of fact. At issue is the question just how much danger must exist before a "hazard" can be found. The Board found a hazard to exist because there was no assurance that pollution would not occur, there was no assurance that the clay was continuous, that no window or other break did not exist, and the result if one did exist would be horrendous indeed—

the pollution of a whole populace's water supply. The petitioner on the other hand contends that the decision was wrong because it was not shown that the petitioner "threatened to cause pollution of the lower Silurian aquifer" and that the burden was on the agency and other complainants to demonstrate with reasonable certainty that the lower aquifer will be polluted.

The question of what constitutes a hazard and how severe the danger is, however, not purely a question of law. Rather the determination of the issue involves the consideration of matters strictly within the expertise of the agency. Accordingly, it is appropriate that this court not substitute its judgment for that of the agency but merely determine whether its decision is reasonable. (See 4 Davis, Administrative Law Treatise, §§30.03-30.05 (1958).) Nevertheless we are in agreement with the Board that a "water pollution hazard" can be found although the actor does not yet threaten to cause pollution. The statute should be read as a whole; surplusage will not presume and each provision and word should be given a reasonable meaning. (*Hirschfield v. Barrett* (1968), 40 Ill. 2d 224, 239 N.E.2d 831, *cert. denied*, 393 U.S. 1062, 21 L. Ed. 2d 706, 89 S. Ct. 716; 34 Ill. L. & Pr. *Statutes* §123 (1958).) Section 12(a) of the Act enjoins, inter alia, "threaten * * * the discharge of any contaminant so as to cause or to tend to cause." If section 12(d) referring to water pollution hazard is not to be rendered superfluous, it must be construed to refer to conduct not yet amounting to a violation of section 12(a). Moreover, the purpose of the Act is to protect the health of the citizens of this State. In order to do this, the Board must be allowed to act where the conduct may endanger the safety of the citizens, there is no assurance that it will not, although by a change in conduct that assurance could be forthcoming, and the result if the potential danger were to be realized would be serious. The Board here reasonably found that allowing the discharge with no knowledge or assurance of the results was a water pollution hazard considering the nearness of the well and the gravity of the result which may well occur.

Our review of the record compiled during the public hearings satisfies us that the evidence introduced by the Agency and by the petitioners supplied the Board with sufficient evidence to support its ruling on each of the section 33(c) factors. The character and degree of injury (section 33(c)(i)) and the suitability of the source in the area (section 33(c)(iii)) were considered at length since the whole concern of the parties and the Board was the danger to the Village of South Elgin considering the proximity of the pollution. There was considerable evidence, including that offered by Tri-County, as to the technical practicability of reducing or eliminating the flow of the leachate and neither Tri-County nor Elgin have anywhere suggested any economic hardship (section 33(c)(iv)), except, as to Elgin, the hardship of now preventing possible future

damage which is due to past activity. There was also evidence (section 33 (c)(ii)) that Site A had since 1966 been used only as a private site for the disposal of incinerator ash from an incinerator in Melrose Park and that it was nearly completely filled. Site B on the other hand accepts refuse from all over the north and west outer suburban area.

While more evidence could have been introduced as to the potential economic hardship to the petitioners and to the surrounding communities if the Board orders are sustained, it must be remembered that the burden of proof as to unreasonable hardship is on the petitioners, not upon the agency (Ill. Rev. Stat. 1975, ch. 111½, par. 1031; *Processing and Books, Inc. v. Pollution Control Board* (1976), 64 Ill. 2d 68, 351 N.E.2d 865), and the Board, in order to make a valid determination that a violation has been committed, is not required to make an unfavorable finding as to each section 33(c) factor (*Sangamo Construction Co. v. Pollution Control Board* (1975), 27 Ill. App. 3d 949, 328 N.E.2d 571.) Yet at no time in the proceedings below did the petitioners suggest that the evidence as to these factors was insufficient, seek to introduce additional evidence as to these matters or request that proper findings be made. How insignificant this whole issue was to the parties is demonstrated by the fact that it was not raised by Tri-County at all on appeal and was raised only in passing by Elgin.

The petitioners' final contention is that the Board erred in levying fines (the maximum of $10,000) against each of them. Originally they had contended (relying on *City of Waukegan v. Environmental Protection Agency* (May 1973), 11 Ill. App. 3d 189, 296 N.E.2d 102) that the grant of power in the Act to the Board to impose monetary penalties was void as an unconstitutional delegation of judicial power. Since the filing of briefs, the Supreme Court (in 57 Ill. 2d 170, 311 N.E.2d 146) has (1974) reversed this and upheld the Board's power to impose monetary penalties. The question remains, however, whether the imposition of the maximum penalty ($10,000) against each of the landfill operators was proper under the facts of this case.

■■ The principal reason for penalties is to aid in enforcement and punitive considerations are secondary. (*City of Monmouth v. Pollution Control Board* (1974), 57 Ill. 2d 482, 313 N.E.2d 161; and see *CPC International, Inc. v. Pollution Control Board* (1975), 32 Ill. App. 3d 747, 336 N.E.2d 601.) And while the Board is vested with broad discretionary powers in imposing penalties (*Monmouth*), the assessment may not be arbitrary (*CPC International, Inc. v. Illinois Pollution Control Board* (1974), 24 Ill. App. 3d 203, 321 N.E.2d 58; *Metropolitan Sanitary District v. Pollution Control Board* (1975), 62 Ill. 2d 38, 338 N.E.2d 392), and the imposition of a fine must be supported by some reasonable factor appearing in the record. (*Bresler Ice Cream Co. v. Pollution Control*

*Board* (1974), 21 Ill. App. 3d 560, 315 N.E.2d 619; *CPC International, Inc. v. Illinois Pollution Control Board* (1974), 24 Ill. App. 3d 203, 321 N.E.2d 56.) The Board itself has stated that it is not its policy to penalize those who were honestly trying. (*Employees of Holmes Bros. v. Merlan, Inc.* (1971), 2 Ill. P.C.B. Op. 405; *Southern Illinois Asphalt Co. v. Pollution Control Board* (1975), 60 Ill. 2d 204, 326 N.E.2d 406.) For these reasons the courts have struck down penalties where the defendant has been sincerely and diligently attempting to conform to the Act and to the rules and regulations and the violation had ceased before any complaint was filed. (*Southern Illinois Asphalt Co. v. Pollution Control Board* (1975), 60 Ill. 2d 204, 326 N.E.2d 406; *Bresler Ice Cream Co. v. Pollution Control Board* (1974), 21 Ill. App. 3d 560, 315 N.E.2d 619; *Chicago Magnesium Casting Co. v. Pollution Control Board* (1974), 22 Ill. App. 3d 489, 317 N.E.2d 689.) Likewise an assessment of penalties was reversed in *High Lake Poultry, Inc. v. Pollution Control Board* (1975), 25 Ill. App. 3d 956, 323 N.E.2d 612, where the Agency's actions contributed to cause the violation and the company had shown its willingness to cooperate. A penalty need not be assessed in every case where a violation is found (*Southern Illinois Asphalt Co. v. Pollution Control Board* (1975), 60 Ill. 2d 204, 326 N.E.2d 406).

■■ Although we have held earlier in this opinion that neither the Environmental Protection Agency nor the Pollution Control Board is estopped by virtue of the earlier approval of the landfill sites by the Agency's predecessor and its approval, as late as 1971, of the operation as satisfactory, such factors are relevant to the propriety of the imposition of penalties (*Freeman Coal Mining Corp. v. Pollution Control Board* (1974), 21 Ill. App. 3d 157, 170-171, 313 N.E.2d 616) and they lead us seriously to doubt that the assessment of a penalty of $10,000 (the maximum under the Act) against each operator was or is justified and we therefore reverse that portion of the order. We also reverse so much of the order as purports to impose, in advance of any ascertainment of the facts, a forfeiture of $20,000 on each operator for any failure effectively to abate the discharge within 180 days. The Board has no authority to require the submission of a penal bond in addition to a performance bond. *Aurora Metal Co. v. Pollution Control Board* (1975), 30 Ill. App. 3d 956, 333 N.E.2d 461.

Accordingly, these portions of the Board's order are reversed but in all other respects the Board's order is affirmed.

Affirmed in part, reversed in part.

GUILD, P. J., and SEIDENFELD, J., concur.